838 F.2d 1031
 51 Fair Empl.Prac.Cas. 435, 90 A.L.R.Fed. 763,
45 Empl. Prac. Dec. P 37,726, 56 USLW 2440
 Alva GUTIERREZ, Plaintiff-Appellee,
v.
MUNICIPAL COURT OF the SOUTHEAST JUDICIAL DISTRICT, COUNTY
OF LOS ANGELES, incorrectly sued as "County of Los Angeles,
a public entity; Porter de Dubovay; John W. Bunnett; and
Russell F. Schooling, in their capacity as officials having
authority to issue personnel rules for employees of the
County of Los Angeles at the Municipal Court of the
Southeast Judicial District," Defendants-Appellants.
Alva GUTIERREZ, Plaintiff-Appellee,
v.
Porter DE DUBOVAY; John W. Bunnett; and Russell F.
Schooling, Defendants- Appellants.
 Nos. 85-5931, 85-6532 and 86-5888.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 5, 1987.
Decided Jan. 27, 1988.
As Amended April 22, 1988.
 
 Larry J. Roberts, Petersen & Ferguson, Santa Ana, Cal., for defendants-appellants.
 Gerald Sato, Allred, Maroko, Goldberg & Ribakoff, Los Angeles, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before BROWNING, TANG and REINHARDT, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 Alva Gutierrez, a Hispanic-American, brought an action challenging an English-only rule enacted by the Southeast Judicial District of the Los Angeles Municipal Court. The district court granted Gutierrez's motion for a preliminary injunction enjoining enforcement of the rule. Appellants challenge the issuance of the injunction and also appeal the district court's denial of their motion for summary judgment on Gutierrez's section 1981, 1983, and 1985(3) claims. Their motion was based on the defenses of absolute and qualified immunity.
 
 
 2
 Because Gutierrez established both a likelihood of success on the merits and the possibility of irreparable injury, we hold that the district court did not abuse its discretion in entering the preliminary injunction. Further, we hold that appellants are not entitled to absolute legislative immunity. Finally, because the district court did not have the opportunity to consider whether Gutierrez's complaint satisfied the pleading requirements that apply when a qualified immunity defense is implicated, we remand for further proceedings.
 
 FACTS & PROCEEDINGS BELOW
 
 3
 The Southeast Judicial District of the Los Angeles Municipal Court employs Alva Gutierrez and a number of other bilingual Hispanic-Americans as deputy court clerks. Gutierrez has held her position since 1978. Bilingual clerks, in addition to their other duties, translate for the non-English speaking public. In March, 1984, the Municipal Court promulgated a new personnel rule which forbade employees to speak any language other than English, except when acting as translators. In December, 1984, the rule was amended to exclude conversations during breaks or lunchtime. However, all other conversations conducted at work remained subject to the rule. The court's actions greatly disturbed Gutierrez and other Hispanic-American employees.
 
 
 4
 Gutierrez filed a complaint with the Equal Employment Opportunity Commission (EEOC) in December, 1984. Subsequently, in March 1985, she filed this action against Municipal Judges Porter de Dubovay, Russell F. Schooling, and John W. Bunnett, and the Southeast Judicial District of the Los Angeles Municipal Court, seeking monetary damages, injunctive relief, and attorneys fees.[1] In her district court complaint, Gutierrez contends that the municipal court rule constitutes racial and national origin discrimination with respect to a term or condition of employment in violation of Title VII, 42 U.S.C. Sec. 2000e-2(a), and that such discrimination denies her the right to make contracts equally with white persons in violation of 42 U.S.C. Sec. 1981. She further asserts that the rule denies her equal protection of the laws and infringes upon her right to free speech in violation of the first and fourteenth amendments to the United States Constitution, and seeks damages for interference with her constitutional rights under 42 U.S.C. Secs. 1983 and 1985(3)[2]. The district judge, finding a likelihood that the rule violated Title VII, granted Gutierrez's request for a preliminary injunction and enjoined appellants from enforcing the rule.[3]
 
 
 5
 Later, Gutierrez sought to depose the three judges, but they refused to answer questions relating to their reasons for adopting the rule and moved for summary judgment. The judges asserted the defenses of absolute legislative immunity and qualified immunity to Gutierrez's non-Title VII claims--i.e., those brought under 42 U.S.C. Secs. 1981, 1983, and 1985(3). The district court denied the motion for summary judgment, ruling first--as to absolute immunity--that the judges did not act as legislators in promulgating a personnel rule for the clerk's office, and second, and without further explanation, that the judges were not entitled to qualified immunity. The district judge then certified the immunity issues to this court. Prior to these rulings, a magistrate had entered an order compelling the Municipal Court judges to answer the questions relating to their motives. The district judge stayed that order pending our further action. We subsequently agreed to decide the immunity issues along with the appeal from the preliminary injunction.[4]
 
 ISSUES PRESENTED ON APPEAL
 
 6
 1. Whether the district court erred in issuing the preliminary injunction restricting enforcement of the English-only rule.
 
 
 7
 2. Whether the district court erred in determining that the municipal court judges were not entitled to absolute immunity.
 
 
 8
 3. Whether the district court erred in determining that the municipal court judges were not entitled to qualified immunity.
 
 
 9
 4. Whether the district court erred in asserting jurisdiction over Gutierrez's Title VII claim.
 
 DISCUSSION
 
 10
 I. THE PRELIMINARY INJUNCTION AND THE TITLE VII CLAIM
 
 
 11
 Appellants contend that the district court erred in issuing a preliminary injunction enjoining the enforcement of a personnel rule that provides:
 
 
 12
 The English language shall be spoken by all court employees during regular working hours while attending to assigned work duties, unless an employee is translating for the non-English-speaking public. This rule does not apply to employees while on their lunch hour or work breaks.
 
 
 13
 Gutierrez challenges the English-only rule under Title VII using adverse impact and disparate treatment theories.[5] She asserts that a regulation mandating the speaking of English-only by its terms has a disproportionate adverse impact on Hispanics. She contends that the rule, although allegedly facially neutral, unfairly disadvantages Hispanics because their ethnic identity is linked to use of the Spanish language. She also notes that Hispanics constitute the vast majority of bilingual persons in the Southeast Judicial District. Gutierrez then separately avers that the rule was intentionally adopted for the purpose of discriminating against Hispanics, that any neutral appearance is pretextual, and, thus, that the rule violates Title VII's proscription against disparate treatment.
 
 
 14
 If Gutierrez is likely to succeed on the merits of her Title VII claim, under either a disparate impact or a disparate treatment theory, and she established the possibility of irreparable injury, or, if she raised serious questions for litigation regarding her Title VII claim and showed that the balance of hardships tipped sharply in her favor, she is entitled to a preliminary injunction. See Dollar Rent A Car, Inc. v. Travelers Indemnity Co., 774 F.2d 1371, 1374 (9th Cir.1985); Benda v. Grand Lodge of the International Association of Machinists & Aerospace Workers, 584 F.2d 308, 314-15 (9th Cir.1978), cert. dismissed, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979). In issuing its injunction, the district court determined that Gutierrez had shown a likelihood of success on the merits, and apparently ruled that irreparable injury could be presumed pursuant to Berg v. Richmond Unified School District, 528 F.2d 1208, 1212 n. 6 (9th Cir.1975), vacated on other grounds, 434 U.S. 158, 98 S.Ct. 623, 54 L.Ed.2d 375 (1977). Because Berg has been vacated it lacks precedential value. See County of Los Angeles v. Davis, 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, 1384 n. 6, 59 L.Ed.2d 642 (1979). Nevertheless, we will affirm the district court's order if Gutierrez met the criteria for the issuance of a preliminary injunction. See Bruce v. United States, 759 F.2d 755, 758 (9th Cir.1985).
 
 A. Likelihood of Success on the Merits
 1. Introduction
 
 15
 Title VII prohibits discrimination in employment based on race, color, sex, religion, and national origin, 42 U.S.C. Sec. 2000e-2, and was intended to assure equality of employment opportunities, eradicate discrimination in employment, and make the victims of employment discrimination whole. See generally International Brotherhood of Teamsters v. United States, 431 U.S. 324, 348, 97 S.Ct. 1843, 1861, 52 L.Ed.2d 396 (1977). Employment discrimination is not limited to discrimination in hiring, firing, or the payment of wages, but includes discriminatory terms and conditions of employment. 42 U.S.C. Sec. 2000e-2(a). Title VII forbids not only intentional discrimination with respect to conditions of employment, but also facially neutral rules which have a disparate impact on protected groups of workers, see Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). A facially neutral rule which falls more harshly on a protected group--such as Hispanics--violates Title VII unless it is justified by business necessity, see Pullman-Standard v. Swint, 456 U.S. 273, 276, 102 S.Ct. 1781, 1783, 72 L.Ed.2d 66 (1982); Atonio v. Wards Cove Packing Co., 810 F.2d 1477 (9th Cir.1987) (en banc) [hereinafter cited as Atonio I ], while a rule or practice that is adopted for the purpose of discriminating against a protected group violates the statute unless it meets the stricter bona fide occupational qualification test. See Dothard v. Rawlinson, 433 U.S. 321, 333, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977); Diaz v. Pan American World Airways, Inc., 442 F.2d 385, 387-88 (5th Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). The first type of case is generally said to present a disparate or adverse impact claim and the second a disparate treatment claim. A disparate treatment claim requires more of a showing by the plaintiff, but also requires the defendant to meet a greater burden in order to overcome that showing. See Atonio v. Wards Cove Packing Co., 827 F.2d 439, 442 (9th Cir.1987) [hereinafter cited as Atonio II ] and n. 8 infra. A plaintiff may bring both types of claims in the same proceeding where the facts alleged warrant relief under either theory.
 
 2. Disparate Impact
 
 16
 In the United States, persons of Asian and Hispanic origin constitute large minorities. Numerous members of these two groups regularly communicate in a language other than English. For many of these individuals Spanish, Mandarin, Cantonese, or some other language is their primary tongue. Members of these minority groups have made great contributions to the development of our diverse multicultural society and its tradition of encouraging the free exchange of ideas. See generally Karst, Paths to Belonging: The Constitution and Cultural Identity, 64 N.C.L.Rev. 303, 361-69, 376-77 (1986) (discussion of assimilation, diversity, and American ideology). The multicultural character of American society has a long and venerable history and is widely recognized as one of the United States' greatest strengths. See id.; Piatt, Toward Domestic Recognition of a Human Right to Language, 23 Hous.L.Rev. 885, 898-900 (1986).
 
 
 17
 Few courts have evaluated the lawfulness of workplace rules restricting the use of languages other than English. Commentators generally agree, however, that language is an important aspect of national origin. See generally Piatt, supra, at 894-98 (discussing the relationship between language and culture); Karst, supra, at 351-57; Comment, Language Discrimination Under Title VII: The Silent Right of National Origin Discrimination, 15 J. Marshall L.Rev. 667, 676 (1982) [hereinafter Comment, Language Discrimination ]; Note, "Official English ": Federal Limits on Efforts to Curtail Bilingual Services in the States, 100 Harv.L.Rev. 1345, 1354 (1987) [hereinafter Note, Official English ]; 29 C.F.R. Sec. 1606.7 (1987). The cultural identity of certain minority groups is tied to the use of their primary tongue. See Comment, Native-Born Acadians and the Equality Ideal, 46 La.L.Rev. 1151, 1165-67 (1986). The mere fact that an employee is bilingual does not eliminate the relationship between his primary language and the culture that is derived from his national origin. See Karst, supra, at 351-57. Although an individual may learn English and become assimilated into American society, his primary language remains an important link to his ethnic culture and identity. See id. The primary language not only conveys certain concepts, but is itself an affirmation of that culture. Piatt, supra, at 894-99.
 
 
 18
 From the standpoint of the Anglo-American, another person's use of a foreign language may serve to identify that individual as being of foreign extraction or as having a specific national origin. See Note, Official English, supra, at 1355; cf. Carino v. University of Oklahoma Board of Regents, 750 F.2d 815, 817, 819 (10th Cir.1984); Berke v. Ohio Department of Public Welfare, 30 Fair Empl.Prac.Cas. (BNA) 387 (S.D. Ohio 1978) (foreign accents identify persons as members of foreign national origins), aff'd, 628 F.2d 980 (6th Cir.1980) (per curiam).[6] Because language and accents are identifying characteristics, rules which have a negative effect on bilinguals, individuals with accents, or non-English speakers, may be mere pretexts for intentional national origin discrimination. See McArthur, Worried About Something Else, 60 Int'l J.Soc.Language 87, 90-91 (1986).
 
 
 19
 Although Title VII does not specifically prohibit English-only rules, the EEOC has promulgated guidelines on the subject.[7] See 29 C.F.R. Sec. 1606.7 (1987). The EEOC recognizes that "[t]he primary language of an individual is often an essential national origin characteristic," and that an English-only rule may "create an atmosphere of inferiority, isolation and intimidation." Id. Sec. 1606.7(a); see also Piatt, supra, at 888, 897. Although an employer may have legitimate business reasons for requiring that communications be exclusively in English, an English-only rule is, according to the EEOC, a burdensome condition of employment that is often used to mask national origin discrimination and that must be carefully scrutinized. See, e.g., Decision 83-7, 31 Fair Empl.Prac.Cas. (BNA) 1861, 1862 (EEOC 1983); see also Piatt, supra, at 905; Note, Official English, supra, at 1358-59. Accordingly, the EEOC concluded that while a limited English-only rule may be permissible in some circumstances, no such rule will be deemed lawful unless the employer can show that it is justified by business necessity and notifies the employees "of the general circumstances when speaking only in English is required and of the consequences of violating the rule." 29 C.F.R. Sec. 1606.7(b, c) (1987). The EEOC's conclusion appears to be based on its determination that rules prohibiting use of foreign languages generally have an adverse impact on protected groups.[8]
 
 
 20
 We agree that English-only rules generally have an adverse impact on protected groups and that they should be closely scrutinized. We also agree that such rules can "create an atmosphere of inferiority, isolation, and intimidation." Id. Sec. 1606.7(a). Finally, we agree that such rules can readily mask an intent to discriminate on the basis of national origin. See Note, Official English, supra, at 137-58; Piatt, supra, at 894-95; Comment, Language Discrimination, supra, at 676 nn. 37, 38. The EEOC guidelines, by requiring that a business necessity be shown before a limited English-only rule may be enforced, properly balance the individual's interest in speaking his primary language and any possible need of the employer to ensure that in particular circumstances only English shall be spoken. The business necessity requirement prevents an employer from imposing a rule that has a disparate impact on groups protected by the national origin provision of Title VII unless there is a sufficient justification under the Civil Rights Act of 1964 for doing so. Accordingly we adopt the EEOC's business necessity test as the proper standard for determining the validity of limited English-only rules.[9]
 
 
 21
 Gutierrez asserts that the limited English-only rule she is challenging has a disparate impact on Hispanic employees of the Southeast Judicial District.[10] There can be no doubt that the use of disparate impact analysis is appropriate here. See Atonio I, 810 F.2d at 1482-86 (majority op.) and 1489-91 (Sneed, J., concurring).[11] Appellants do not disagree. However, they argue, relying on Garcia v. Gloor, 618 F.2d 264 (5th Cir.1980), cert. denied, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981), that, whatever the impact of English-only rules in other circumstances, in this case the impact is not disparate or adverse because Gutierrez is bilingual and can easily comply with the rule.[12] Appellants assert that where an employee can readily observe an English-only rule, a failure to comply is nothing more than a matter of personal preference. For the reasons already given, we do not think English-only rules can so easily be immunized from judicial scrutiny.
 
 
 22
 We note that in Jurado v. Eleven-Fifty Corp., 813 F.2d 1406, 1410-11 (9th Cir.1987), a case decided after oral argument, we cited Garcia v. Gloor in support of our decision that a radio station's English-only rule, with which its disc-jockey employee could readily comply, did not have an adverse impact on that employee. However, the issues involved in Jurado were far different from the ones presently before us. The Jurado rule was considerably more restricted than and bore little or no resemblance, either in purpose or effect, to the edict of the Municipal Court judges. The Jurado rule was clearly a reasonable one that met the business necessity test: further, it had only a minimal impact on the protected group of employees. Jurado involved an order by a radio station to a single disc jockey to cease his occasional on-the-air use of Spanish because the station had determined that his interspersing of comments in a foreign language during his broadcasts confused the audience and was potentially damaging to the station's ratings. Id. at 1410. The Jurado order pertained solely to on-the-air broadcasting--the product the employer was offering the public. The employer did not require Jurado, or any other employee, to conduct his off-the-air conversations in English; it sought only to control the essential nature of its product. Clearly there can be no question that the employer in Jurado had the right to decide that it would offer its broadcasts entirely in the English language, and clearly the impact of its decision on the single affected employee was slight.[13]
 
 
 23
 In contrast, the English-only rule in the case before us is concerned primarily with intra-employee conversations, work-related and non-work-related. It is in no way limited to the sale or distribution of the employer's product[14] and there is no contention that the employees' conversations among themselves in Spanish have any effect on those who use the courts. Yet, the prohibition on intra-employee communications in Spanish is sweeping in nature and has a direct effect on the general atmosphere and environment of the work place. Under these circumstances, ease of compliance has little or no relevance; certainly, it is not a factor that could preclude a finding of disparate impact.
 
 3. Business Necessity
 
 24
 We next address appellants' argument that their English-only rule is justified by business necessity. Appellants offer five alleged justifications. In examining these justifications, we begin with the proposition that business necessity means more than business purpose. See Atonio II, 827 F.2d at 442. In order to meet the business necessity exception the justification must be sufficiently compelling to override the discriminatory impact created by the challenged rule. Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971) (cited with approval in Atonio II, 827 F.2d at 443). In addition, the practice or rule must effectively carry out the business purpose it is alleged to serve, and there must be available no acceptable less discriminatory alternative which would accomplish the purpose as well. Id. As the Tenth Circuit put it: "The practice must be essential, the purpose compelling." Williams v. Colorado Springs School District No. 11, 641 F.2d 835, 842 (10th Cir.1981) (quoted with approval in Atonio II, 827 F.2d at 442).
 
 
 25
 The first justification offered by appellants is that the United States is an English-speaking country and California an English-speaking state. That self-evident fact provides little support for the restrictive rule the municipal court judges imposed on their Spanish-speaking employees. While appellants vigorously urge that there is a substantial state interest in having a single language system, the prohibition of intra-employee Spanish communication does little to achieve that result, especially since as a part of their official duties the Court's bilingual employees are required to communicate in Spanish on a regular basis with numerous members of the non-English-speaking public. Thus, the rule cannot be said to effectively carry out the asserted purpose, and the first justification cannot support a finding of a business necessity. See Blake v. City of Los Angeles, 595 F.2d 1367, 1383 (9th Cir.1979), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980); Robinson, 444 F.2d at 798.
 
 
 26
 Second, appellants contend that the rule is necessary to prevent the workplace from turning into a "Tower of Babel." This claim assumes that permitting Spanish (or another language) to be spoken between employees is disruptive. Even if appellants' unspoken premise were true, the argument fails in part for some of the reasons already suggested. Since Spanish is already being spoken in the Clerk's office, to non-English-speaking Hispanic citizens, part of the "babel" that appellants purport to fear is necessary to the normal press of court business. Additional Spanish is unlikely to create a much greater disruption than already exists. Because the "babel" is necessary and has an apparently permanent status, its elimination in the area of intra-employee communication cannot be termed essential to the efficient operation of the Clerk's office. See Atonio II, 827 F.2d at 442; Robinson, 444 F.2d at 798.
 
 
 27
 Third, appellants assert that the rule is necessary to promote racial harmony. They contend that Spanish may be used to convey discriminatory or insubordinate remarks and otherwise belittle non-Spanish-speaking employees. Appellants, however, have failed to offer any evidence of the inappropriate use of Spanish.[15] In contrast, there is evidence indicating that racial hostility has increased between Hispanics and non-Spanish-speaking employees because Hispanics feel belittled by the regulation. There is also evidence that non-Spanish-speaking employees have made racially discriminatory remarks directed at Hispanics. As the EEOC has warned, prohibiting the use of the employees' native tongue may contribute to racial tension. 29 C.F.R. Sec. 1606.7(a) (1987). Appellants' argument that the English-only rule fosters racial harmony is unsupported by evidence and is otherwise generally unpersuasive. See Piatt, supra, at 897.
 
 
 28
 Appellants further contend that whatever the actual facts may be, non-Spanish-speaking employees believe that Spanish-speaking employees use Spanish to conceal the substance of their conversations and that the English-only rule is necessary to assuage non-Spanish-speaking employees' fears and suspicions. Appellants' contention is based on a single complaint allegedly made by an employee, a complaint based, at most, on suspicion. Again, there is simply no probative evidence of the Spanish language being used to conceal the substance of conversations. However, even if there were evidence that a regulation mandating the use of English during working hours would calm some employees' fears and thereby reduce racial tension to some extent, this reason would not constitute a business necessity for a rule that has an adverse impact on other persons based on their national origin. Existing racial fears or prejudices and their effects cannot justify a racial classification. Palmore v. Sidoti, 466 U.S. 429, 433-34, 104 S.Ct. 1879, 1882-83, 80 L.Ed.2d 421 (1984). Nor may such fears or prejudices constitute the business necessity for a rule that burdens a protected class. See id.; see also City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 448, 450, 105 S.Ct. 3249, 3259, 3260, 87 L.Ed.2d 313 (1985).
 
 
 29
 Fourth, appellants assert that the English-only rule is necessary because several supervisors do not speak or understand Spanish and cannot discern whether employees are correctly disseminating information unless English is spoken. This argument is illogical as well as unpersuasive. Bilingual employees are required to speak Spanish when dealing with the non-English-speaking public; they are specifically hired for that purpose because Spanish is the primary tongue of the majority of the members of the public who use the courts in the Southeast Judicial District. Supervisors may well be unable to determine whether the information disseminated to the public by bilingual employees is correct but that is only because when the bilingual employees are communicating with the non-English-speaking public in the only language that those persons understand, the supervisors are incapable of following the discussion. The municipal court rule in question in no way enables supervisors more effectively to evaluate or control the dissemination of information to the public. Compare Decision 83-7, 31 Fair Empl.Prac.Cas. (BNA) at 1862 (limited English-only rule was necessary to ensure safe performance of emergency and abnormally hazardous procedures). It is apparent that the best way to ensure that supervisors are apprised of how well the bilingual employees are performing this part of their assigned tasks would be to employ Spanish-speaking supervisors. Because appellants are willing to allow persons who communicate with the public in Spanish to be supervised by non-Spanish-speaking employees, we find their explanation that supervisors must be able to understand intra-employee communications to be disingenuous at best.
 
 
 30
 Next, appellants argue that the English-only rule is required by the California Constitution. Cal. Const. art. III, Sec. 6. Appellants assert that section 6, added by the voters as a ballot initiative in 1986, requires the use of English in all official state business, and thus requires Hispanic employees to communicate in English while at work.[16]
 
 
 31
 Appellants' argument is unpersuasive for three basic reasons. First, a fair reading of section 6 does not support appellants' interpretation of the measure. Section 6 does not provide that English must be spoken under the circumstances specified in the municipal court's rule, or even suggest that such should be the general policy of the state. Section 6 declares only that "English is the official language of the State of California," Cal. Const. art. III, Sec. 6(b), and mandates only that "[t]he Legislature shall enforce this section by appropriate legislation," Cal. Const. art. III, Sec. 6(c). While section 6 may conceivably have some concrete application to official government communications, if and when the measure is appropriately implemented by the state legislature, it appears otherwise to be primarily a symbolic statement concerning the importance of preserving, protecting, and strengthening the English language. Cal. Const. art. III, Sec. 6(a); cf. Puerto Rican Organization for Political Action v. Kusper, 490 F.2d 575, 577 (7th Cir.1973).
 
 
 32
 Second, appellants contend, relying on the arguments contained in the ballot initiative, that section 6 was intended to require that all communication occurring at a governmental place of business be conducted in English.[17] Accordingly, they reason, section 6 applies, inter alia, to casual intra-employee or supervisor-employee conversations. Even giving the broadest possible construction to the legislative history of section 6, as set forth in the ballot initiative materials,[18] and even assuming we would give that history conclusive weight, we cannot agree. Although the precise question of private conversations among public employees was not addressed in the ballot arguments, it appears that the distinction the proponents attempted to draw was between official communications and private affairs. While the initiative addressed, and arguably may have sought to regulate, the former subject, most if not all of the speech barred here would fall in the latter category. Again, we note that, ironically, while the English-only rule at issue here totally bars private speech in Spanish during on-duty periods, use of the Spanish language for official communications is not only permitted by the government employer, but in a large number of instances is expressly mandated.[19]
 
 
 33
 Third, contrary to appellants' arguments, the adoption of a constitutional provision or a state statute does not ipso facto create a business necessity. See Dothard, 433 U.S. at 331 n. 14, 97 S.Ct. at 2728 n. 14. A state enactment cannot constitute the business justification for the adoption of a discriminatory rule unless the state measure itself meets the business necessity test; otherwise employers could justify discriminatory regulations by relying on state laws that encourage or require discriminatory conduct. Id. For federal law purposes, it is immaterial whether inadequate justifications directly underlie the actions of a government agency or are incorporated in the constitution of a state. In either case, if the proferred justifications fail to meet the business necessity test they are legally insufficient.
 
 
 34
 For the above reasons, section 6 cannot serve as a justification for the municipal court's rule.
 
 4. Summary
 
 35
 English-only rules generally have an adverse impact on protected groups and ordinarily constitute discriminatory conditions of employment. Here, none of the justifications appellants offer for their English-only rule meets the rigorous business necessity standard. See Robinson, 444 F.2d at 798. Thus there appears to be no basis for making an exception to the general rule. Accordingly, the district court correctly determined that Gutierrez established a likelihood of success on the merits on her adverse impact claim.
 
 
 36
 B. Irreparable Injury and Balance of Hardships
 
 
 37
 Although the district court presumed irreparable harm in reliance on invalid legal authority, its decision to issue the preliminary injunction was not erroneous. Gutierrez has established a likelihood of success on the merits as to her adverse impact claim. See supra at 1039-1045. To qualify for a preliminary injunction on that claim she must show only that she faces the possibility of irreparable injury from enforcement of the rule. See Dollar Rent A Car, 774 F.2d at 1374.
 
 
 38
 Gutierrez has clearly established a possibility of irreparable injury. " 'When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.' " Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir.1984) (quoting 11 C. Wright & A. Miller, Federal Practice & Procedure, Sec. 2948, at 440 (1973)); see also Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (plurality opinion). Similarly, when the right the plaintiff is allegedly deprived of constitutes an important aspect of a person's identity--as does the right involved here--no additional injury need be shown. Money damages are inadequate compensation for the threatened loss in either case.
 
 
 39
 Moreover, permitting the English-only rule to be enforced pending trial might well have other deleterious effects. Prohibiting the exercise of one right protected by Title VII may discourage employees from exercising other rights protected by that statute. See Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 938-39 (9th Cir.1987); Garcia v. Lawn, 805 F.2d 1400, 1405 (9th Cir.1986). Further, a rule that has the effect of creating or heightening racial or national origin tension in the workplace raises the specter of ongoing discrimination. Gutierrez has offered evidence that the imposition of the English-only rule has contributed to a workplace atmosphere that derogates Hispanics, encourages discriminatory behavior by non-Hispanic supervisory and non-supervisory employees, and heightens racial animosity between Hispanics and non-Hispanics. Compare Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 2405-06, 91 L.Ed.2d 49 (1986) (pervasive sexual harassment may create an intimidating, hostile, or offensive working environment actionable under Title VII). For these reasons also, the injury to Gutierrez cannot be fully recompensed by an award of money damages.
 
 C. Conclusion
 
 40
 Entry of a preliminary injunction halting the enforcement of a discriminatory employment practice is within the purpose of the Civil Rights Act of 1964, so long as the customary prerequisites for an injunction are met. Gutierrez established a likelihood of success on the merits as well as the possibility of irreparable injury. Therefore, the district court properly issued a preliminary injunction.[20]
 
 
 41
 Finally, we note that the district court's injunction is more favorable to the employer than the business necessity test permits: the injunction allows restrictions to be imposed based on public relations concerns.[21] Public relations concerns do not constitute a business necessity. See Diaz v. Pan American World Airways, Inc., 442 F.2d 385, 388-89 (5th Cir.), cert. denied, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971); Decision 81-25, 27 Fair Empl.Prac.Cas. (BNA) 1820, 1822 (EEOC 1981). If such concerns were sufficient a major goal of Title VII would be thwarted because employers would be free to consider public prejudices when setting employment policies and determining employment practices. Such a result would be wholly inconsistent with Title VII, which was intended to overcome the effect of prejudice on employment opportunities. See Diaz, 442 F.2d at 389. Having already discussed the proper definition of the business necessity test, see supra at 1041, we simply mention the "public relations concerns" issue for the court's guidance in its further proceedings.[22]
 
 II. IMMUNITY AND THE DAMAGE CLAIMS
 A. Absolute Legislative Immunity
 
 42
 Following issuance of the preliminary injunction, Gutierrez proceeded with discovery and deposed appellants. The municipal court judges refused to answer certain questions until the district court determined whether the defenses of absolute and qualified immunity entitled them to summary judgment. Appellants first assert that they are absolutely immune from suit because they acted in a legislative capacity in enacting the English-only rule.[23] We review the district court's determination regarding immunity de novo. Cf. Capoeman v. Reed, 754 F.2d 1512, 1513 (9th Cir.1985).
 
 
 43
 Members of legislative bodies, whether state, local, or regional, have absolute immunity from suit based on their acts undertaken as part of the legislative function. See Supreme Court of Virginia v. Consumers Union, 446 U.S. 719, 731-33, 100 S.Ct. 1967, 1974-75, 64 L.Ed.2d 641 (1980); Lake Country Estates v. Tahoe Regional Planning Agency, 440 U.S. 391, 405, 99 S.Ct. 1171, 1179, 59 L.Ed.2d 401 (1979); Kuzinich v. County of Santa Clara, 689 F.2d 1345, 1349-50 (9th Cir.1982). Absolute immunity protects the legislative process by shielding lawmakers from civil liability based on their legislative role which necessarily involves the balancing of social needs and rights of different groups. See Kuzinich, 689 F.2d at 1350-51. Individuals who are not legislators but whose acts are sufficiently legislative in nature are also absolutely immune from liability for those acts. See Supreme Court of Virginia, 446 U.S. at 731-33, 100 S.Ct. at 1974-75. A legislative act involves " 'the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct.' " Cinevision Corp. v. City of Burbank, 745 F.2d 560, 580 (9th Cir.1984) (quoting Yakus v. United States, 321 U.S. 414, 424, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944)), cert. denied, 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985).
 
 
 44
 The promulgation of a rule governing the conduct of clerical employees is best characterized as an administrative function, rather than a legislative or judicial one. See Goodwin v. Circuit Court of St. Louis County, Missouri, 729 F.2d 541, 549 (8th Cir.1984), cert. denied, 469 U.S. 1216, 105 S.Ct. 1194, 84 L.Ed.2d 339 (1985); cf. Supreme Court of Virginia, 446 U.S. at 731-33, 100 S.Ct. at 1974-75; Crooks v. Maynard, 820 F.2d 329, 334 (9th Cir.1987) (order and contempt order issued to correct administrative problem was a judicial act); Cinevision, 745 F.2d at 580. Personnel rules govern what are essentially internal affairs of a particular employer and are in that respect markedly dissimilar from state bar disciplinary rules or land-use ordinances, for example, which are of general applicability, at least within an affected profession, industry or type of business. Cf. Supreme Court of Virginia, 446 U.S. at 721-24, 100 S.Ct. at 1969-71; Lake Country Estates, 440 U.S. at 394, 99 S.Ct. at 1173; Kuzinich, 689 F.2d at 1350. A work rule is not transformed into legislation merely because the employer is a public entity. Because, in promulgating the challenged personnel rule, appellants acted in their capacity as an employer, and not in a legislative capacity, they are not entitled to assert the defense of legislative, or absolute, immunity.[24]
 
 
 45
 B. Qualified Immunity and the Pleading of Unconstitutional
 
 Motive
 1. Introduction
 
 46
 Appellants next assert that they are entitled to qualified immunity from suits brought under sections 1981, 1983, and 1985(3). Claims pleaded pursuant to those sections have varying requirements, but in some instances it is necessary to allege intentional discrimination. For example, a section 1981 claim always requires purposeful discrimination and therefore cannot be based solely on a disparate impact theory. See General Building Contractors Association v. Pennsylvania, 458 U.S. 375, 386-88, 102 S.Ct. 3141, 3147-49, 73 L.Ed.2d 835 (1982). On the other hand, a claim brought pursuant to section 1983 may or may not require intent; the requirements for section 1983 claims are the same as those for establishing the underlying constitutional or statutory violations. See Baker v. McCollan, 443 U.S. 137, 140 & n. 3, 99 S.Ct. 2689, 2692 & n. 3, 61 L.Ed.2d 433 (1979). Here, Gutierrez alleges a section 1983 claim based primarily upon a violation of the equal protection clause. Because purposeful discrimination is an essential element of an equal protection clause violation, Gutierrez's section 1983 claim requires her to prove intentional discrimination. See Personnel Administrator v. Feeney, 442 U.S. 256, 276, 99 S.Ct. 2282, 2294, 60 L.Ed.2d 870 (1979).[25] Finally, a claim brought under section 1985(3) requires a direct or indirect purpose to "depriv[e] ... any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws," and a classor race-based animus. Griffin v. Breckenridge, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 1798-99, 29 L.Ed.2d 338 (1971); see Bretz v. Kelman, 773 F.2d 1026, 1028 (9th Cir.1985) (en banc). Because the district court was not asked to rule on any motion to dismiss, we do not now consider whether Gutierrez has met the requisite pleading requirements for her various causes of action; however, for reasons we explain infra at 1052-1053, it may be necessary for the district court to do so on remand.
 
 2. Clearly Established in General
 
 47
 In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that government officials performing discretionary functions are entitled to qualified immunity unless, in taking the challenged action, they violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. at 2738; see also Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); Ward v. County of San Diego, 791 F.2d 1329, 1332 (9th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); Guerra v. Sutton, 783 F.2d 1371, 1374 (9th Cir.1986). For purposes of Harlow, government officials are charged with knowledge of constitutional and statutory developments, including all available decisional law. Ward, 791 F.2d at 1332; see also Capoeman, 754 F.2d at 1513-14.
 
 
 48
 There is little authority on the question how a court should determine whether a constitutional or statutory right is clearly established. Capoeman, 754 F.2d at 1514; see also Anderson, 107 S.Ct. at 3039. Ordinarily, courts begin by attempting to determine whether the statutory or constitutional provision creating the right is unambiguous. Where the existence of the right is clear from the face of the provision, courts usually need go no further. However, where ambiguities exist, we "look to whatever decisional law is available to ascertain whether the law is clearly established." Capoeman, 754 F.2d at 1514; see also Ward, 791 F.2d at 1332. In doing so, we may also consider the likelihood that we would reach the same conclusion as other courts that have previously considered the issue. Capoeman, 754 F.2d at 1515; see also Ward, 791 F.2d at 1332. Finally, we should note that the term "clearly established right" may be somewhat misleading in that in some cases the relevant inquiry may more properly be described as: whether it is clearly established that the particular act by the public official constitutes a violation of the right involved, rather than whether the right itself is clearly established. Cf. Anderson, 107 S.Ct. at 3038-39 (while right to be free from unlawful warrantless searches of one's home is clearly established, court of appeals should have focused on the particular facts of the search under challenge to see whether it was clearly established that the officer's conduct was unlawful). The latter type of inquiry is not, however, appropriate in cases in which intentional or purposeful discrimination is an element of the offense. See section II.B.4.infra, at 1049-1051.
 
 
 49
 3. Pre-existing Law and the English-Only Rule
 
 
 50
 When the municipal court adopted its English-only rule, there was no binding decisional authority on point in this circuit. In fact, as we previously noted, supra at 1039, there was a dearth of judicial authority concerning English-only rules. The only outstanding federal appellate court decision was Garcia v. Gloor, 618 F.2d 264 (5th Cir.1980), cert. denied, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). In that case, the Fifth Circuit had upheld an English-only rule saying that it only prevented some employees from exercising "a preference to converse in Spanish" and did not constitute national origin discrimination. Id. at 271.
 
 
 51
 On the other hand, shortly after the Fifth Circuit decided Garcia, the Equal Employment Opportunity Commission, the agency charged with administering employment discrimination law, adopted a contrary position. In December of 1980, the EEOC promulgated guidelines providing that a total prohibition on speaking languages other than English will be presumed invalid, and that a limited prohibition will be found permissible only when it is justified by a clear business necessity. 45 Fed.Reg. 85632, 85636 (1980) (codified at 29 C.F.R. Sec. 1606.7 (1986)). Subsequently, the guidelines were construed in two significant EEOC decisions which shed considerable light on their proper interpretation. See Decision 81-25, 27 Fair Empl.Prac.Cas. (BNA) at 1821-22 (customer preference does not constitute business necessity); Decision 83-7, 31 Fair Empl.Prac.Cas. (BNA) at 1862 (English-only rule limited to communication during emergencies and while conducting inherently dangerous procedures constituted business necessity). While the EEOC guidelines are not binding on the courts, they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Meritor Savings Bank, 106 S.Ct. at 2405 (quoting General Electric Co. v. Gilbert, 429 U.S. 125, 141-42, 97 S.Ct. 401, 410-11, 50 L.Ed.2d 343 (1976), quoting in turn Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944)).
 
 
 52
 We need not decide in this case, whether, in the absence of decisional law, EEOC guidelines and decisions can constitute clearly established law. Here, judicial precedent existed and it appears to have been inconsistent, at least in part, with the guidelines. If contrary judicial precedent had been issued subsequent to the guidelines, there is no question that we would hold that the guidelines do not "clearly establish" the law. Although the answer is not as certain when the guidelines are issued after a judicial decision, where that decision has been rendered by a federal circuit court and the subsequently issued guidelines remain largely untested, we think it appropriate to reach the same conclusion. Thus, we hold that in the case before us the EEOC guidelines did not serve to clearly establish the law regarding the validity of English-only rules.
 
 4. Purposeful Discrimination
 
 53
 Our conclusion that the invalidity of English-only rules was not clearly established does not end our inquiry, for, as we have noted, Gutierrez has alleged that appellants imposed the rule for the purpose and with the intent of discriminating against Hispanics, in violation of Title VII and the equal protection clause of the Fourteenth Amendment. She now argues that because appellants purposefully discriminated against Hispanics, they violated clearly established law. In support of this argument, she points out that both the Fourteenth Amendment and Title VII unequivocally forbid intentional racial or national origin discrimination. Thus, she concludes, appellants clearly knew they could not engage in purposeful acts of discrimination, and since they acted with a discriminatory motive, they are not entitled to claim qualified immunity.
 
 
 54
 Gutierrez's argument raises an interesting and important question which requires us to consider the history and purpose of the qualified immunity rule. The current rule is designed to protect government officials from "broad-reaching discovery" and "trial" in cases involving insubstantial claims. Harlow, 457 U.S. at 817, 102 S.Ct. at 2737. Prior to Harlow, an official was entitled to qualified immunity unless he "knew or reasonably should have known that the action he took ... would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury." Id. at 815, 102 S.Ct. at 2737 (quoting Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975)). The rule was largely subjective in nature and permitted plaintiffs to subject government officials to exhaustive legal inquiries on the basis of unsupported suspicions. The Harlow Court, in seeking to protect government officials from vexatious litigation based on bare allegations of malice, decreed that thereafter the availability of the qualified immunity defense would depend on objective considerations, rather than on the subjective intent of the government actor. The Court then set forth its "clearly established" test.
 
 
 55
 While the Harlow rule provided clear answers to a number of questions, it initially resulted in considerable uncertainty regarding some types of claims, and particularly those in which unlawful motivation or intent was an essential element of the alleged violation. The issue that arose post-Harlow was whether, notwithstanding that decision, courts could consider the actor's discriminatory intent or motive in cases in which the existence of a violation was dependent on proof of such intent. The courts were faced with an awkward choice. On the one hand, it would appear that judicial consideration of the actor's motive would restore in at least one important category of cases the subjective test that Harlow sought to eliminate. On the other hand, if intent or motive could not be considered, courts would be unable to reach a significant number of acts that are unlawful solely because of the actor's motivation. For example, if a public employer terminates a black employee because he is black, that act clearly violates federal constitutional and statutory law. If, however, the employer terminates the black employee because of incompetence, then the discharge obviously does not violate the law at all. The act itself--the act of discharge--is neutral; it is the motive or intent that makes the act both actionable and violative of clearly established law. See Martin v. D.C. Metropolitan Police Department, 812 F.2d 1425, 1433 n. 17 (D.C.Cir.1987); Goodwin, 729 F.2d at 545-46; see also Lowe v. City of Monrovia, 775 F.2d 998, 1010-11 (9th Cir.1985).
 
 
 56
 The United States Court of Appeals for the District of Columbia soon recognized the problem that would be created by too literal a reading of Harlow and quickly resolved the dilemma in a manner that was thereafter followed, either explicitly or implicitly, by all other circuits that have considered the question. The District of Columbia Circuit concluded that where unlawful intent or motive is an essential element of the challenged conduct, the act cannot be analyzed apart from the actor's intent and the court must consider that intent in determining whether the defense of qualified immunity is available. Martin, 812 F.2d at 1431; Hobson v. Wilson, 737 F.2d 1, 26-29 (D.C.Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).[26] In Hobson, Judges Edwards, Scalia (now Justice Scalia), and Starr held that while each "individual act ... shown to have [been] committed was lawful," the defendants were not entitled to qualified immunity because of their motive: the court found that the individual acts were undertaken "in a specific effort 'to disrupt and interfere with the plaintiffs' political activities.' " Hobson, 737 F.2d at 26-27. The District of Columbia Circuit unequivocally reaffirmed its Hobson analysis earlier this year in Martin and explained its original reasoning in greater detail. It said that an interpretation of Harlow that excluded all inquiry into motivation would "insulate officials from liability in all cases in which the substantive prescription makes the official's state of mind an essential component of the alleged constitutional violation." Martin, 812 F.2d at 1433 (emphasis added). The court added that such a result was not intended by Harlow. It then concluded that "when the governing precedent identifies the defendant's intent (unrelated to knowledge of the law) as an essential element of plaintiff's constitutional claim, the plaintiff must be afforded an opportunity to overcome an asserted immunity with an offer of proof of the defendant's alleged unconstitutional purpose." Id. (citation omitted).[27]
 
 
 57
 Our circuit has also previously held that a government official is not entitled to qualified immunity from a Section 1981 or 1983 action that is based on a claim of intentional discrimination. See Lowe, 775 F.2d at 1011. As we said there, it is well-established that an individual has a "right not to be refused employment ... because of her race or sex. A reasonable person would have been aware that the practices ... were unlawful if ... they were intended to deprive Blacks or women of employment opportunities." Id. Similarly, the Eighth Circuit has held that qualified immunity is not a defense in a case in which invidious discrimination on the basis of sex has been established. Goodwin, 729 F.2d at 546. The Eighth Circuit explained that intentional discrimination is not subject to a Harlow -type qualified immunity defense because "[t]he right to be free of invidious discrimination on the basis of sex certainly is clearly established, and no one who does not know about it can be called 'reasonable' in contemplation of law." Id. In so holding the court quoted our language from Flores v. Pierce, 617 F.2d 1386, 1391-92 (9th Cir.), cert. denied, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980):
 
 
 58
 No official can ... impose discriminatory burdens on a person or group by reason of a racial or ethnic animus against them. The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it.
 
 
 59
 Goodwin, 729 F.2d at 546 (quoting Flores, 617 F.2d at 1391-92).[28] Intentional invidious discrimination was an essential element of the claims in Lowe and Goodwin. Whether the qualified immunity defense was available in these cases turned on whether the act was taken for the purpose and with the intent of discrimination. Both cases held that if discriminatory animus was present, then the act alleged to have resulted in a deprivation of rights violated clearly established law. The same is true in the case before us.
 
 
 60
 We hold, along with the District of Columbia Circuit, that where the lawfulness of a challenged act is dependent upon the actor's motive or intent, the purpose for which the act was undertaken must be analyzed and not just the act itself. We also hold that in deciding whether a defendant is entitled to qualified immunity in cases in which unlawful motive is a critical element, the court must consider the actor's intent in carrying out the act that is alleged to have resulted in the violation of the plaintiff's rights. Specifically, we reaffirm our Lowe decision and agree with the Eighth Circuit that qualified immunity is not a defense in cases involving intentional racial or other similar discrimination, including national origin.[29]
 
 
 61
 5. Pleading Requirements and Limited Discovery
 
 
 62
 The District of Columbia Circuit recognized that the rule it adopted in Hobson could provide the means for an end run around the Harlow objective test. The court acknowledged that "[I]n some instances, plaintiffs might allege facts demonstrating that defendants have acted lawfully, append a claim that they did so with an unconstitutional motive, and as a consequence usher defendants into discovery, and perhaps trial, with no hope of success on the merits. The result would be precisely the burden Harlow sought to prevent." Hobson, 737 F.2d at 29. In an effort to pretermit the use of such tactics, the court held that in cases involving contentions that defendants acted with an unlawful motive, plaintiffs must present nonconclusory allegations containing evidence of unlawful intent in their complaint or the case would be subject to dismissal prior to the taking of any discovery. Id.; see also Elliott v. Perez, 751 F.2d 1472, 1479-81 (5th Cir.1985). The allegations, the court said, must be sufficiently precise to place "defendants on notice of the nature of the claim and enable them to prepare a response and, where appropriate, a summary judgment motion." Hobson, 737 F.2d at 29; and compare Elliott, 751 F.2d at 1482 ("Once a complaint ... adequately raises the likely issue of immunity ... the district court should on its own require of the plaintiff a detailed complaint alleging with particularity all material facts on which he contends he will establish his right to recovery, which will include detailed facts supporting the contention that the plea of immunity cannot be sustained."). While, unlike the Eighth Circuit, we do not place the burden on the district court to police the pleadings, we adopt the District of Columbia Circuit's rule that, in order to survive a motion to dismiss, plaintiffs must state in their complaint nonconclusory allegations setting forth evidence of unlawful intent.
 
 
 63
 Upon being served with a complaint which lacks sufficient nonconclusory allegations of evidence of unlawful intent, a public official who would ordinarily be entitled to raise a qualified immunity defense, and who wishes to avoid discovery, may either move for dismissal for failure to state a claim, or file an answer and move for judgment on the pleadings. See Mitchell v. Forsyth, 472 U.S. 511, 526-27, 105 S.Ct. 2806, 2815-16, 86 L.Ed.2d 411 (1985); Fed.R.Civ.P. 12(c) and (h)(2). Here, appellants answered the complaint but did not file either of those motions. Instead, at their depositions, they asserted a "legislative and administrative" privilege and refused to answer questions concerning their motives in enacting the English-only rule. When Gutierrez moved to compel answers, appellants asserted the defenses of absolute and qualified immunity and filed their own motion, for summary judgment. The gist of appellants' argument on appeal is that because Gutierrez's claim of unlawful motive is based on bare allegations of malice, the defense of qualified immunity must be upheld. That argument, properly stated, would be as follows:
 
 
 64
 Gutierrez is alleging intentional discrimination. In order to plead such a claim against a public official, she must allege specific facts. She has failed to do so.
 
 
 65
 Thus, although appellants' motion was titled a motion for summary judgment, as appellants now appear to recognize, the motion in actuality challenges the sufficiency of the complaint and functions properly as a motion to dismiss for failure to state a claim or for judgment on the pleadings.
 
 
 66
 Although the district court might have, sua sponte, treated appellants' summary judgment motion as a motion to dismiss and applied the Hobson standards, it was not required to, and did not, do so.[30] In short, the district court never ruled on the sufficiency of Gutierrez's complaint; rather, without explanation, it simply stated that the appellants were not entitled to rely on a qualified immunity defense. The court's failure to rule on the sufficiency of Gutierrez's complaint is certainly understandable, since appellants failed to make a motion to dismiss and failed to call the court's attention to any inadequacy in the complaint. Moreover, the law regarding the pleading of unconstitutional motive and qualified immunity was far from clear and the procedural posture of the case was, to say the least, confused. Now, on appeal, appellants suggest that Gutierrez should be permitted to amend her complaint and that the district court should then determine whether the amended pleading can withstand a motion to dismiss. Although appellant's suggestion is belated, it has considerable merit. Because of the uncertainty that existed as to the law and because the district judge was not afforded an opportunity to consider the complex legal issues in an appropriate context, we think a remand may provide the best vehicle for allowing the parties to have their pre-trial disputes resolved in an orderly and efficient manner.[31] Other courts have followed that course in similar circumstances. See, e.g., Elliott, 751 F.2d at 1479-80.
 
 
 67
 We note that, subsequent to Hobson, the District of Columbia Circuit suggested that where a defendant asserts on a summary judgment motion that the plaintiff has failed to plead the facts with sufficient specificity, rather than making that claim in connection with a motion to dismiss, a somewhat different rule applies. In Martin, the court said that in summary judgment cases the plaintiff should be permitted to conduct a limited amount of discovery, if the discovery is narrowly confined to "particularized interrogation of the defendants for the circumscribed purpose of ascertaining whether there is any substance to" the plaintiff's assertions of unconstitutional motive. 812 F.2d at 1438. Thus, where the defendant relies on factual material, the plaintiff is afforded some opportunity to discover the critical facts before being compelled to defend his complaint.
 
 
 68
 While the District of Columbia Circuit's limited discovery rule for summary judgment cases makes considerable sense, and while the appeal before us is from a summary judgment motion, we need not now determine whether to follow that portion of Martin. Here, Gutierrez was entitled to the order compelling defendants to answer the questions as to motive because of her Title VII claims for permanent injunctive relief. Gutierrez's right to pursue those claims was not challenged in the district court or before us, and defendants do not assert any immunity as to them. Defendants assert both absolute and qualified immunity as to the non-Title VII claims only. Since Gutierrez has the right to pursue her Title VII claims, and immunity is not an issue, appellants cannot refuse to answer deposition questions relevant to those claims, including questions relating to motive, or insist that their responses to those questions be postponed until after the court rules on their motions relating to the other claims. Thus, whether or not we follow the discovery rule laid down in Martin, Gutierrez is entitled to obtain the answers to her pending questions without further delay.
 
 6. Conclusion
 
 69
 At the time appellants adopted their English-only rule, it was not clearly established that such rules were unlawful. Accordingly, to the extent that any claim for monetary damages is based on a disparate impact theory, appellants' qualified immunity defense would serve as a bar. However, Gutierrez's damage claims, including her section 1983 claim, are based primarily, if not exclusively, on allegations of purposeful discrimination. Discriminatory intent is an essential element of a 1983 action where the underlying claim is a violation of the equal protection clause. Qualified immunity is not a defense in such cases. Nevertheless, the concerns that led to Harlow have also led to the adoption of rules requiring plaintiffs alleging purposeful discrimination by public officials to set forth in their complaints non-conclusory allegations containing evidence of unlawful intent. Gutierrez's complaint has not been tested under that standard. Accordingly, we remand for further proceedings with respect to the pleadings issues. Finally, for the reasons we have explained, appellants must now answer the questions regarding their motives in accordance with the order of the magistrate.
 
 III. JURISDICTION UNDER TITLE VII
 
 70
 Appellants also contend that the district court lacked jurisdiction over Gutierrez's Title VII claim for three reasons. These challenges can be readily resolved.
 
 A. The Right to Sue Letter
 
 71
 Appellants assert that the district court lacked jurisdiction over Gutierrez's Title VII claim because she filed this action in March, 1985 but did not receive her right-to-sue letter from the EEOC until September, 1985. They contend that her early filing interfered with conciliation attempts. There is no evidence in the record to support this contention, and appellants admit that the lack of a right-to-sue letter at the time of filing a lawsuit may be cured by the later issuance of the letter. See Jones v. Bechtel, 788 F.2d 571, 573 (9th Cir.1986); Wrighten v. Metropolitan Hospitals, Inc., 726 F.2d 1346, 1351 (9th Cir.1984). Established precedent is controlling. Any jurisdictional problem created by the initial lack of a right-to-sue letter was cured. Wrighten, 726 F.2d at 1351.
 
 B. The EEOC Charge
 
 72
 Appellants next contend that they are not proper defendants because they were not named individually in the EEOC charge which Gutierrez filed against the Municipal Court. "EEOC charges should be construed liberally." Wrighten, 726 F.2d at 1352. In Wrighten, we said that a Title VII action may be brought against persons not named in the EEOC charge "as long as they were involved in the [challenged] acts." Id. Subsequently, in Carter v. Smith Food King, 765 F.2d 916, 924 n. 10 (9th Cir.1985), we stated that plaintiffs could bring actions against defendants not named in the prior administrative proceeding "under certain circumstances." From the examples we gave in Carter, it is clear that several types of connections between the party named in the charge and a new party named in the legal action are sufficient: for example, a connection between a corporate or governmental employer and a supervisor, a union and one of its officials, a union and a related organization, and an employer and an independent contractor that trains and supervises its employees. Appellants do not dispute that such a connection exists here, specifically the connection between governmental employer and supervisor. The municipal court judges have supervisory control over certain working conditions of the municipal court's employees. Accordingly, whether we apply the all-encompassing Wrighten standard or look to the type of connection that Carter suggests may be required, the failure to list appellants in the EEOC charge does not preclude Gutierrez from naming them as defendants in the current litigation.
 
 C. Appellants As Employers
 
 73
 Appellants finally argue that Los Angeles County is Gutierrez's employer and that Gutierrez may not sue individuals who do not employ her.[32] More to the point, it is the Clerk of the Municipal Court, Joseph Sharar, who supervises her, and the Clerk is appointed by appellants. Cal.Govt.Code Sec. 71181. Further, the municipal court judges are authorized by statute to promulgate personnel rules for court employees. Cal.Govt.Code Sec. 72002.1. The record establishes that the Clerk is responsible for enforcement of those rules. The judges thus possess authority to control working conditions in the Clerk's office. Cal.Govt.Code Sec. 72002.1. If not the direct employers, appellants exercise supervisory authority over the employees. As such, they are proper parties. See Carter, 765 F.2d at 918 n. 1.
 
 
 74
 AFFIRMED IN PART; REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.
 
 
 
 [1]
 Gutierrez originally named Los Angeles County as a defendant. The district court dismissed the County apparently determining that the County, of which the Municipal Court is a part, did not promulgate and could neither rescind nor enforce the rule. The question of the appropriateness of that dismissal is not presently before us
 
 
 [2]
 Appellants argue that Gutierrez lacked standing to seek preliminary injunction because her employment status was uncertain. They contend that it is unlikely that she will return to work. The record below was in dispute on this point and apparently the district court found in Gutierrez's favor. Even were we to review the record de novo (which we do not) we would not conclude that she lacks standing
 
 
 [3]
 The injunction set forth an exception: it provided that the use of communications in a foreign language could be forbidden where the prohibition was necessary for valid business or public relations purposes and the reasons for the ban were articulated to the workforce in writing. We discuss the exception infra at 1045-46
 
 
 [4]
 The district court also certified, and we accepted, several Title VII jurisdictional issues for review. We discuss those issues in the last section of this Opinion
 
 
 [5]
 In view of the result we reach with respect to Gutierrez's Title VII claim, we need not decide whether the preliminary injunction could also be based on her section 1983 claims that the rule denied her equal protection of the laws and violated her right to freedom of expression; nor, for the purposes of this part of our Opinion, need we consider whether her section 1981 and 1985(3) claims could justify issuance of the challenged order
 
 
 [6]
 This point was also made effectively in Olagues v. Russoniello, 797 F.2d 1511, 1520-21 (9th Cir.1986) (en banc), vacated on ground of mootness, --- U.S. ----, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987). Although we agree with the analysis contained in the vacated opinion, we do not, of course, rely on it as precedent
 
 
 [7]
 We note that EEOC guidelines are generally entitled to considerable deference so long as they are not inconsistent with Congressional intent. Espinoza v. Farah Mfg. Co., 414 U.S. 86, 94-95, 94 S.Ct. 334, 339-40, 38 L.Ed.2d 287 (1973)
 
 
 [8]
 The EEOC guidelines distinguish between blanket prohibitions, which require English to be spoken at all times, and limited prohibitions, which require English to be spoken only at certain times or under certain conditions. See 29 C.F.R. Sec. 1606.7(a, b) (1987). A blanket prohibition will rarely, if ever, be upheld. It is presumed invalid. Limited English-only rules fare only somewhat better. They will be held valid only if they pass the business necessity test. Id. Sec. 1606.7(b). See discussion of test infra at 1041
 
 
 [9]
 We note that the part of the EEOC guidelines that refers to business necessity is, under general principles of equal employment opportunity law, applicable only to cases in which the employer has acted without invidious intent. Where a rule is shown to have been adopted for the purpose of discriminating against a protected group, the employer's conduct is permissible only if the discriminatory rule constitutes a bona fide occupational qualification (BFOQ) for the job. Thus, even a limited English-only rule must meet the stricter BFOQ test, see supra at 1038, if it is the product of discriminatory intent
 
 
 [10]
 The original version of the municipal court's rule provided for a blanket prohibition (notwithstanding the exception for translation duties). However, Gutierrez's action is directed at the amended rule which, by virtue of the lunchtime and break provisions, qualifies as a limited ban
 
 
 [11]
 Because we conclude below that Gutierrez was entitled to a preliminary injunction on her disparate impact claim, we need not consider whether the order could be supported by her disparate treatment claim as well. In the event the parties proceed to a trial on the merits, Gutierrez is, of course, free to pursue both claims
 
 
 [12]
 Appellants also claim that Gutierrez has not stated a claim under the fourteenth amendment, relying on Carmona v. Sheffield, 475 F.2d 738 (9th Cir.1973), and therefore, that she cannot state a claim under Title VII, apparently arguing that Title VII is coextensive with the fourteenth amendment. We disagree. The Carmona case did not involve a Title VII claim, but rather a constitutional challenge. Title VII is a broad remedial statute that was intended to strike at many forms of discrimination that may not be actionable under the fourteenth amendment. See, e.g., Griggs, 401 U.S. at 431-33, 91 S.Ct. at 853-54
 
 
 [13]
 Significantly, at the same place in Jurado that we cited Garcia we cited with approval the EEOC English-only guidelines, and specifically mentioned the business necessity requirement. 813 F.2d at 1411
 Also significantly, had Jurado had difficulty in complying with the English-only rule, that fact would not have affected our decision. A disc jockey may be required to speak English as a condition of employment and, as we concluded, may be required to broadcast exclusively in that language if the station owner so desires. The ability to speak the language in which the program is to be broadcast is obviously a bona fide occupational qualification for any broadcaster. Thus, despite our reference to Garcia, the determinative issue in Jurado was not the fact that Jurado was able to comply with the rule; it was that the employer had the right to insist that the broadcast be conducted exclusively in English.
 
 
 [14]
 In fact the rule does not appear to apply at all to contacts between employees and the public. To the contrary, the employees affected by the rule are compelled, as part of their job, to speak Spanish with members of the public on numerous occasions. Among their official duties is the answering of questions by, and the providing of information to, Spanish-speaking persons seeking access to the courts
 
 
 [15]
 Three supervisors submitted affidavits on this aspect of appellants' case. However, all three supervisors acknowledge that they do not speak Spanish and therefore cannot know whether employees are using Spanish to convey discriminatory or insubordinate remarks. The affidavits, in the absence of any evidence of the misuse of Spanish, indicate only that the speaking of Spanish unnerves the supervisors. The supervisors' feelings toward the use of the Spanish language may reflect a prejudice toward the use of a tongue that they do not understand, and also may indicate a bias against Hispanic-Americans. Unfortunately, monolingual persons may be threatened by the speaking of a language that they themselves cannot speak. Piatt, supra, at 894-95
 
 
 [16]
 Section 6 provides:
 (a) Purpose
 English is the common language of the people of the United States of America and the State of California. This section is intended to preserve, protect and strengthen the English language, and not to supersede any of the rights guaranteed to the people by this Constitution.
 (b) ...
 English is the official language of the State of California.
 (c) Enforcement
 The Legislature shall enforce this section by appropriate legislation. The Legislature and officials of the State of California shall take all steps necessary to insure that the role of English as the common language of the State of California is preserved and enhanced. The Legislature shall make no law which diminishes or ignores the role of English as the common language of the State of California.
 (d) ...
 Any person who is a resident of or doing business in the State of California shall have standing to sue the State of California to enforce this section....
 
 
 [17]
 Where a measure is enacted by the voters rather than the legislature, the ballot materials are recognized as important guides for determining legislative intent. Amador Valley Joint Union High School Dist. v. State Bd. of Equalization, 22 Cal.3d 208, 245-46, 149 Cal.Rptr. 239, 257-58, 583 P.2d 1281, 1300 (1978) (voter materials helpful in determining the probable meaning of uncertain language), overruled on other grounds sub nom. Los Angeles County Transportation Comm'n v. Richmond, 31 Cal.3d 197, 182 Cal.Rptr. 324, 643 P.2d 941 (1982)
 
 
 [18]
 "Government must protect English ... by functioning in English...." Argument in Favor of Proposition 63, California Ballot Pamphlet 46 (Nov. 4, 1986)
 
 
 [19]
 We also note that if the Municipal Court rule forbade communication in Spanish with the non-English-speaking public, serious questions of denial of access to the courts would be presented, and possibly other constitutional questions as well
 
 
 [20]
 We note, incidentally, that the effect of the injunction will be to maintain the status quo. There is no indication in the record that the municipal court will be unable to function normally and efficiently without the English-only rule, nor does the record show that an injunction will seriously disrupt or inconvenience municipal court operations. Cf. Los Angeles Memorial Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1203-04 (9th Cir.1980)
 
 
 [21]
 The injunction provides that:
 [D]efendants, ... are ... enjoined and prohibited pendente lite, from requiring plaintiff and other employees of the Municipal Court of the Southeast Judicial District of Los Angeles County to communicate only in the English language during working hours; provided that, defendants may restrict employee communication in other than the the English language under any circumstances dictated by valid business and public relations concerns articulated to the work force in writing.
 (Emphasis added in final clause.)
 
 
 [22]
 We also note that we seriously doubt the propriety of using the term "business concerns" as a substitute for "business necessity." We have previously concluded that "business necessity" means more than "business purpose." Atonio II, 827 F.2d at 442. Similarly it would appear to mean more than "business concerns"
 
 
 [23]
 Appellants argued below, but do not assert here, that Gutierrez sued them in their official capacity as state officers, and thus was attempting to sue the State of California. The Eleventh Amendment prohibits suits for damages against the states in federal court. Kentucky v. Graham, 473 U.S. 159, 169, 105 S.Ct. 3099, 3107, 87 L.Ed.2d 114 (1985). A suit against state officers in their official capacity is simply another way of suing the state. Id.; see also Cory v. White, 457 U.S. 85, 90, 102 S.Ct. 2325, 2328, 72 L.Ed.2d 694 (1982). Assuming arguendo that municipal court judges are state officers, to the extent that Gutierrez seeks damages from appellants in their official capacity, her claim would be barred. The district court originally certified the eleventh amendment issue to this court for review but at appellants' request, amended its certification order to omit that contention and add several others. Appellants sought the amended order on the ground that the record no longer supported an eleventh amendment defense. The district court, in altering its certification order, apparently agreed, concluding either that Gutierrez had sued the defendants individually, in their personal capacities as her employers, rather than in their official capacities, or that municipal court judges are not state officers
 
 
 [24]
 Appellants specifically disclaim any reliance on absolute judicial immunity although they suggest that the defense might have been available, citing Forrester v. White, 792 F.2d 647 (7th Cir.1986). The Supreme Court has just reversed Forrester and held that when supervising employees a judge "act[s] in an administrative capacity" and is not protected by absolute judicial immunity. Forrester v. White, --- U.S. ----, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)
 
 
 [25]
 Other section 1983 claims have different requirements. See, e.g., Little v. City of North Miami, 805 F.2d 962, 967 (11th Cir.1986) (per curiam) (discussing requirements for section 1983 claim alleging unlawful retaliation in connection with exercise of first amendment rights.). On this appeal, Gutierrez does not rely on her Title VII claim as the triggering provision for her section 1983 action. Thus we need not consider here whether that statutory provision, which itself does not provide for damages, may indirectly serve as the basis for such relief
 
 
 [26]
 Since Harlow, the Supreme Court has not considered a qualified immunity case in which intent or motive was an element of the offense. Compare Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), in which the issue was whether under the particular facts and circumstances "a reasonable officer could have believed Anderson's warrantless search to be lawful," an inquiry the Court described as "objective (albeit fact-specific)." Id. 107 S.Ct. at 3040
 
 
 [27]
 Judge Starr dissented from the majority opinion, but only on the issue of how much evidence of unlawful motive a plaintiff was required to plead before discovery could be had under the test established in Hobson. Significantly, Judge Starr concurred fully in the portion of the decision we discuss here. We note that, originally, the District of Columbia Circuit granted rehearing en banc and vacated part IV of the Martin opinion, the part Judge Starr objected to. Martin v. D.C. Metro. Police Dep't, 817 F.2d 144 (D.C.Cir.1987). The court has since reconsidered its decision to grant an en banc hearing, denied the petition for rehearing en banc, and reinstated part IV of the opinion. Martin v. D.C. Metro. Police Dep't, 824 F.2d 1240 (D.C.Cir.1987)
 
 
 [28]
 The Eighth Circuit found our Flores language still applicable in the post-Harlow era, and we agree. Cf. Lowe, 775 F.2d at 1011
 
 
 [29]
 If the plaintiff fails to establish that the discrimination was intentional, the claim fails. If the plaintiff does establish such intent, there can be no qualified immunity. Thus, it seems simpler to say that qualified immunity is not a defense in such cases, rather than that the defense prevails where proof of intentional discrimination is not established
 
 
 [30]
 We assume without deciding that with proper notice the court could have reclassified the motion in that manner. It would then, however, have been required to disregard all supporting factual material not contained in the pleadings
 
 
 [31]
 We note that in keeping with the purpose of this remand--the district judge should, as appellants suggest, allow Gutierrez to amend her complaint before considering any motion to dismiss
 
 
 [32]
 We note that at least for some purposes, appellants are county officials. See Villanazul v. City of Los Angeles, 37 Cal.2d 718, 724, 235 P.2d 16 (1951); 68 Op.Cal.Att'y Gen. 127, 133 (1985). Recently, a California appeals court held that a municipal court judge is a county rather than a state employee. Hamilton v. Workers' Compensation Appeals Bd., 196 Cal.App.3d 542, 242 Cal.Rptr. 67 (1987)