726 F.2d 1346
 33 Fair Empl.Prac.Cas. 1714,
33 Empl. Prac. Dec. P 34,137
Naomi C. WRIGHTEN, Jesse Blocker, Jr., and Wilma P. Graham,
individually and on behalf of all others similarly
situated, Plaintiffs-Appellants,
v.
METROPOLITAN HOSPITALS, INC., an Oregon non-profit
corporation, Emanuel Lutheran Charity Board, Inc., an Oregon
non-profit corporation, doing business as Emanuel Hospital,
and Red Top Inc., a Delaware Corporation doing business in
Oregon as Red Top Hospital Services, Inc., Defendants-Appellees.
 Nos. 79-4658, 79-4665 and 81-3440.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 3, 1982.
Decided Jan. 31, 1984.
As Amended Feb. 29, 1984.
 
 Curtis G. Oler, San Francisco, Cal., for Graham.
 Diane White, Tigard, Or., for Wrighten.
 James H. Clarke, Spears, Lubersky, Campbell & Bledsoe, Harry S. Chandler, E. Joseph Dean, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for Metro. & Emanuel.
 Appeal from the United States District Court For the District of Oregon.
 Before KILKENNY, GOODWIN and POOLE, Circuit Judges.
 GOODWIN, Circuit Judge.
 
 
 1
 Naomi Wrighten, Wilma Graham and Jesse Blocker, Jr., appeal from the district court's judgment for the defendants in plaintiffs' employment discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq., and 42 U.S.C. Sec. 1981.[1] Plaintiffs claimed that Metropolitan Hospitals Inc. [Metro], Emanuel Hospital [Emanuel], and Red Top, Inc. [Red Top] discriminated against them because they were black, and sought declaratory and injunctive relief as well as damages. All plaintiffs are former employees of Emanuel, for whom Metro provided management services. Red Top provided training and supervisory personnel for the Emanuel housekeeping department where Blocker worked. Wrighten and Graham were nurses.
 
 
 2
 On appeal plaintiffs argue that the district court erred in (1) denying class certification; (2) granting summary judgment for Red Top and Metro; (3) ruling that Blocker's claims were time-barred, granting partial summary judgment against him and finding that he was not terminated as a pretext for racial discrimination; (4) ruling that Emanuel did not discriminate against Graham and Wrighten nor improperly discharge them in retaliation for protests against unlawful employment practices; and (5) affirming the clerk's assessment of costs against plaintiffs. We affirm the district court on all issues except those arising out of Wrighten's termination. The district court should reassess her costs in light of this opinion.
 
 
 3
 Naomi Wrighten is a black registered nurse, employed by Emanuel Hospital from 1974 until her termination in 1976. She worked as a staff nurse. Wilma Graham is a black licensed practical nurse employed by Emanuel for more than 14 years before her termination in 1976. Jesse Blocker, Jr., is a black man, employed in Emanuel's housekeeping department from 1971 until his termination in 1977. He was the union steward for Local 49 of the Service Employees International Union at Emanuel.
 
 
 4
 In 1975 Emanuel instituted two important changes in personnel administration. It contracted with Red Top, Inc., to provide management and supervisory services in the housekeeping department. It also instituted "primary nursing care" in place of "team nursing," which altered the duties of registered nurses and gave them fewer administrative duties than before.
 
 
 5
 Some of Wrighten's claims stemmed from the change in nursing duties. She believed her workload under the new primary patient care system was disproportionately heavy. She also believed that she should have been promoted to a head nurse position when that job became vacant in 1975.
 
 
 6
 In late 1975 and early 1976 Wrighten wrote letters to Emanuel's personnel director stating dissatisfaction with black patient care and her employment situation. Early in March 1976, she and Graham had three unproductive meetings with Emanuel's personnel director and its president, Roger Larson. Several members of the black community[2] were in attendance. At one of the meetings Wrighten made dramatic and specific charges of black patient mistreatment. Soon thereafter she and Graham called a press conference off hospital grounds to protest black patient care at the hospital.
 
 
 7
 The day after the press conference, Barbara Weleber, Wrighten's supervisor, criticized Wrighten's job performance because of the charges and the press conference. Weleber directed Wrighten to stop discussing personal matters during her duty time, to stop accepting so many personal phone calls while on duty, and to remain on the hospital grounds during her half-hour breaks. Weleber's orders upset Wrighten and she and Graham again met with Larson. They were unable to settle the controversy. Larson then appointed a committee of members of the black community to look into matters. The committee's actual mission is unclear. Larson suspended both Wrighten and Graham from patient care duties and assigned them to work, at regular pay, with the committee. He denied both of them access to the hospital grounds during the committee's work.
 
 
 8
 The committee met sporadically. On April 16, 1976, its chairman informed Larson that Wrighten and Graham had not cooperated and had not provided information to substantiate their complaints. Larson then informed Wrighten that he was terminating her employment as of April 23.
 
 
 9
 Larson decided to reinstate Graham to her regular nursing duties but she did not respond to his phone calls or mail notices. On April 26, 1976, Larson took Graham's silence and failure to report for work as a constructive resignation. We do not consider Graham's suspension and ultimate termination of employment because she appeals only the assessment of costs against her.
 
 
 10
 Blocker's complaints of racial discrimination began long before Red Top took over management and supervisory services in the housekeeping department. He perceived a consistent pattern of discrimination against him. He asserts that he was not informed about Red Top management employment opportunities nor accepted by Red Top in his union steward capacity because of his race and because he had often advocated the causes of other black employees who had protested discriminatory employment practices. He contends that his unfavorable job evaluations were unfair and were a mere pretext for firing him in 1977. He claims that he should have been promoted to the position of supervisor of housekeeping, a position filled instead by a black woman. He claims that he was disfavored because he had been active in complaining about discriminatory practices while the person who received the promotion had not complained or protested.
 
 JURISDICTION
 
 11
 Blocker, Graham and Wrighten filed timely Title VII charges with the E.E.O.C. in March 1976. The E.E.O.C. deferred the charges to the State of Oregon. Some thirty days later, Blocker, Graham and Wrighten filed this action in federal district court. In April 1978, the E.E.O.C. issued each plaintiff a "right to sue" letter because "more than 180 days have expired since the filing of the charge." The case went to trial in October 1978.
 
 
 12
 The trial court found correctly that the subsequent issuance of the "right to sue" letters cured any jurisdictional defects.[3] Berg v. Richmond Unified School District, 528 F.2d 1208, 1212 (9th Cir.1975). Although the case was filed prematurely, the "right to sue" letters issued before trial. There is no evidence that early filing of the Title VII claim precluded the state from performing its administrative function. Pinkard v. Pullman-Standard, 678 F.2d 1211, 1218-1219, n. 6 (5th Cir.1982). Premature suits are always subject to a motion to dismiss and there was none here. Id. at 1218. Further, defendants have made no showing of prejudice. Love v. Pullman Co., 404 U.S. 522, 526, 92 S.Ct. 616, 618, 30 L.Ed.2d 679 (1972).
 
 CLASS CERTIFICATION
 
 13
 Blocker, Graham and Wrighten initially sought to bring this action as a class action. The trial court refused to certify the class, primarily because it doubted that plaintiffs' counsel would adequately represent the class. The court enumerated a number of deficiencies on the part of counsel. Counsel did not move for class certification until 90 days after the case had been filed, when the motion should have been filed within 60 days;[4] he instructed his clients not to answer pertinent questions within the scope of Emanuel's discovery; he did not properly respond to requests for discovery; he disrupted depositions with inappropriate comments; he apparently did not associate local counsel as required by Local Rule 110-2(b) until after filing the class action motion; and his pleadings and interrogatories had an "assembly line" quality that suggested something less than the forthright and vigorous approach required of counsel in class actions.
 
 
 14
 The court cited other reasons for its decision, including the difficulty that Blocker, Graham and Wrighten had in furnishing factual information about discrimination against other members of the class; their lack of the minimum financial ability to carry a class action until it could generate other support; and their response to Emanuel's detailed attack on their ability to serve as class representatives with bare assertions reciting the language of Fed.R.Civ.P. 23(a)(4).
 
 
 15
 This court will not overturn denial of class certification unless the trial court abused its discretion. Moore v. Hughes Helicopters, Inc., 708 F.2d 475, 480 (9th Cir.1983). Doninger v. Pacific Northwest Bell, Inc., 564 F.2d 1304, 1309 (9th Cir.1977). A trial court correctly considers the competence of counsel when deciding to grant or deny class certification. Fendler v. Westgate-California Corp., 527 F.2d 1168, 1170 (9th Cir.1975). See also, Al-Jundi v. Rockefeller, 88 F.R.D. 244, 248 (W.D.N.Y.1980); Wofford v. Safeway Stores, Inc., 78 F.R.D. 460, 486 (N.D.Cal.1978).
 
 
 16
 The magistrate's findings and recommendation, adopted by the trial court, displayed considerable sympathy towards the plaintiffs and potential class members. The decision to recommend noncertification was in part a decision to preserve the possibility of successful subsequent class litigation if members of the proposed class could engage the services of competent counsel. The court correctly perceived a danger that the counsel then in the case could take a good case and lose it for a large class.
 
 DISMISSAL OF METRO
 
 17
 The trial court adopted the magistrate's finding that Metro should be dismissed because plaintiffs did not allege that any Metro employee had discriminated against them. Uncontroverted affidavits stated that Metro and Emanuel were separate entities and that Metro was not a co-owner with Emanuel. Although Metro and Emanuel had a management contract under which Metro performed certain services for Emanuel, ultimate control over the personnel policies and practices of the hospital remained with the Emanuel board.
 
 
 18
 The record contains no evidence that Metro was involved in any discrimination against Wrighten, Graham or Blocker. While Emanuel's president, Roger Larson, also was a Metro employee, he acted in his capacity as president of Emanuel during the incidents at issue in this case. The trial court properly entered summary judgment for Metro dismissing it as a defendant.
 
 BLOCKER'S CLAIMS
 
 19
 The trial court adopted the magistrate's recommendation that Blocker's claims against Red Top be dismissed because Red Top was not named in the charge filed with the E.E.O.C. This was error. E.E.O.C. charges should be construed liberally. Title VII charges can be brought against persons not named in an E.E.O.C. complaint as long as they were involved in the acts giving rise to the E.E.O.C. claims. Chung v. Pomona Valley Community Hospital, 667 F.2d 788, 792 (9th Cir.1982). Blocker's claims against Red Top were virtually identical to those against Emanuel, and Emanuel was named in the E.E.O.C. complaint.
 
 
 20
 The trial judge, however, did permit plaintiffs to file a supplemental brief alleging Red Top's retaliatory discharge of and failure to promote Blocker. The court found Red Top to be an agent of Emanuel, and made findings on Blocker's allegations against Emanuel. Given the confused nature of Blocker's claims against Emanuel and Red Top, the trial court performed an unnecessarily difficult task in separating the claims. Furthermore, because of plaintiffs' total lack of statistical evidence, the trial court was forced to evaluate statistical evidence presented by defendants to determine whether plaintiffs had made a prima facie case of disparate impact against either Emanuel or Red Top. The trial court found that Blocker had met his burden of establishing a prima facie case against Emanuel for his termination in 1977. Red Top, an admittedly "hard taskmaster," was found to be acting as Emanuel's agent in terminating Blocker. The court then found that Emanuel had legitimate, nondiscriminatory reasons for terminating Blocker's employment. Those reasons included a record of reprimands and generally poor work performance. Data indicated that the percentage of blacks adversely affected by Red Top's termination practices was not significantly greater than their representation in the work force under Red Top supervision, and that the hospital's employment practices did not disproportionately affect minority persons. Hence, no prima facie case of discrimination was raised against Red Top.
 
 
 21
 We conclude that the trial court's error in dismissing Red Top was harmless. The court made substantial inquiries into and findings about both Red Top and Emanuel regarding their dealings with Blocker. It also considered Blocker's contention that Emanuel refused to deal with him as a union steward because of his race. There is no evidence to suggest that the result in Blocker's case would have been different if Red Top had not been dismissed.
 
 
 22
 The trial court also adopted the magistrate's finding that Blocker's claims under Title VII and 42 U.S.C. Sec. 1981 were barred by the statute of limitations. On appeal the only challenge is to the Sec. 1981 claim.
 
 
 23
 The controlling limitation period for Sec. 1981 is the most appropriate statute of limitations under state law. The trial court applied the two-year statute of limitations of O.R.S. 12.110(1). This court has applied the six-year period of O.R.S. 12.080(2) ("liability created by statute") as the controlling time period for Sec. 1981 challenges. Plummer v. Western International Hotels Co., Inc., 656 F.2d 502, 506 (9th Cir.1981). The trial court thus erred in granting partial summary judgment on Blocker's claims of discrimination in 1972 and 1973 on the grounds that they were time barred.
 
 
 24
 The trial court's error here, however, as with the dismissal of Red Top, was harmless. There is no evidence to suggest that the result in Blocker's case would have been any different had a six-year statute of limitations period been applied. The trial court's findings and conclusions on disparate impact and discriminatory intent regarding Blocker are affirmed.
 
 GRAHAM'S CLAIMS
 
 25
 Graham contended that she was improperly discharged, but the trial court found against her on the facts. The trial court's findings are supported by evidence and withstand reversal under Fed.R.Civ.P. 52. The trial court found that the defendant hospital offered to restore Graham to her regular employment. An offer was made by registered mail and by telephone calls from authorized representatives. The court found that she refused to accept the registered letter and refused to answer the telephone. The court's findings that she voluntarily refused to return to work answer her claim that the hospital wrongfully discharged her. The judgment on that point is affirmed.
 
 WRIGHTEN'S CLAIMS
 
 26
 Wrighten argues that she should have been promoted to the head nurse position when it became available at Emanuel; that institution of the primary patient care system in 1976 was a demotion for her; that under the new system her workload was disproportionately heavy; that she was denied educational and travel funds; that she was generally harassed and intimidated by her Emanuel superiors; and that she was fired in retaliation for her advocacy of issues relating to black staff and patients. We consider the termination issue separately.
 
 
 27
 Applying the tests of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the court found that Wrighten made a prima facie case on the issue of promotion, but that Emanuel successfully showed that the decision to promote someone else was not a pretext for discrimination against her. The court found that she failed to make a prima facie case on each of her other claims. Although it did not specifically make a finding on the claim that Wrighten had a disproportionately heavy workload under the new patient care system, the court did discuss the issue and implicitly found against her on this claim. The trial court's findings on Wrighten's claims of disparate impact and discriminatory intent were not clearly erroneous in light of the evidence produced by plaintiffs at trial. We therefore affirm. Shah v. Mt. Zion, 642 F.2d 268, 271 (9th Cir.1981).
 
 
 28
 Wrighten's termination, however, poses a more difficult factual and legal problem. Title 42 U.S.C. Sec. 2000e-3 provides that an employer cannot discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter," or "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."
 
 
 29
 A plaintiff bringing an action under this section is required to establish a prima facie case of retaliation by showing that she engaged in a protected activity, that she was thereafter subjected to adverse employment action by her employer, and that there was a causal link between the two. Cohen v. Fred Meyer, 686 F.2d 793, 796 (9th Cir.1982).[5] If the plaintiff makes a prima facie case, the burden of production shifts to the defendant employer to articulate some legitimate, nonretaliatory reason for the adverse action. Id. If the employer makes such a showing, the employee must be afforded a fair opportunity to show that a discriminatory intent motivated the employer's action. This may be accomplished indirectly by showing that the employer's proffered explanation was a pretext, or directly by showing that a discriminatory reason more likely motivated the employer's action. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). If the plaintiff succeeds at this point, a presumption is created that the adverse employment action was the product of discriminatory intent, which can be rebutted by the employer's showing by a preponderance of the evidence that the adverse action would have been taken even in the absence of discriminatory intent. Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1142 (11th Cir.1983).
 
 
 30
 This orderly method of evaluating evidence in cases of alleged retaliatory discharge never was intended to be rigid, mechanistic, or ritualistic. The critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant intentionally discriminated or retaliated against the plaintiff for engaging in protected activity. U.S. Postal Service v. Aikens, --- U.S. ----, ----, 103 S.Ct. 1478, 1483, 75 L.Ed.2d 403, 51 U.S.L.W. 4354, 4356 (1983). In the simpler language of this circuit, it must be established by a preponderance of the evidence that engaging in protected activity under Sec. 2000e-3 was one of the reasons for termination, and that but for such activity a plaintiff would not have been fired. Kauffman v. Sidereal Corp., 695 F.2d 343, 345 (9th Cir.1982).
 
 
 31
 If a plaintiff engages in activity not protected by Sec. 2000e-3, the analysis is different. A plaintiff's participation in unprotected activity is itself a legitimate, nondiscriminatory reason for an employer to take a negative employment action. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The defendant employer is responsible for introducing evidence at trial that a plaintiff's actions were unprotected under Sec. 2000e-3. Payne v. McLemore's Wholesale, 654 F.2d 1130 at 1143-1144 (5th Cir.1981). See also Novotny v. Great Am. Federal Sav. & L. Assn., 584 F.2d 1235, 1259-1261 (3d Cir.1978).
 
 
 32
 In this action the trial court assumed without proof that Wrighten directed her opposition at unlawful employment practices at Emanuel Hospital. See Silver v. KCA, Inc., 586 F.2d 138, 141 (9th Cir.1978). Her activities were entirely lawful. See McDonnell Douglas, 411 U.S. at 803, 93 S.Ct. at 1824. The court concluded, however, that Wrighten exceeded the protection of Sec. 2000e-3 because she went "too far in her activities and general deportment." This conclusion is essentially a factual one and must be reviewed under Fed.R.Civ.P. 52.
 
 
 33
 The trial court held that Wrighten's means of opposition were unreasonable in view of Emanuel's interest in maintaining a harmonious and efficient operation. Similar language appeared in Silver v. KCA, 586 F.2d at 141, which adopted a concept conceived in Hochstadt v. Worcester Foundation, 545 F.2d 222, 233 (1st Cir.1976). In Silver, the court upheld the termination of an employee who had protested the racial slurs of a fellow employee on the grounds that Title VII extends protection only to employees protesting the unlawful practices of their employers. 586 F.2d at 141. That case is inapposite here because Wrighten's protests were aimed at her employer's alleged discriminatory practices, not at those of a co-worker.
 
 
 34
 Hochstadt is a closer case to Wrighten's. Hochstadt involved a research biologist who raised havoc in her laboratory for three years and then protested her termination on Title VII grounds. She interrupted regular staff meetings, circulated rumors, commissioned a covert affirmative action survey, invited a newspaper reporter to examine confidential salary information, misused secretarial and copying services, ran up a $500 personal bill on the laboratory's telephone, was reprimanded on several occasions for poor work, and was the cause of two other research assistants leaving the laboratory. Hochstadt v. Worcester Foundation, 545 F.2d at 227-229. In the face of Hochstadt's obstreperous behavior over a prolonged period of time, the court upheld her termination as legitimate and nondiscriminatory. Id. at 233. It adopted a balancing test for determining whether an employee's conduct is protected under Sec. 2000e-3: a court must balance "the purpose of the Act to protect persons engaging reasonably in activities opposing ... discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." Id. at 231 (footnote omitted).
 
 
 35
 Hochstadt must be read narrowly lest legitimate activism by employees asserting civil rights be chilled.[6] Nonetheless, the trial court found that the hospital had legitimate, nondiscriminatory grounds for termination. While Wrighten's complaints against Emanuel were not wholly without foundation, the court found that Wrighten had gone "too far." Wrighten met with the hospital's affirmative action officer and president on several occasions before going public with her complaints about black patient care. Under these circumstances, and given the trial court's subsidiary factual findings, Wrighten's activities did not exceed the protection of Sec. 2000e-3. There may be situations where activity such as Wrighten's, if coupled with conduct of a disruptive nature, may exceed statutory protection. It did not in this instance. Wrighten did not impede the goals of Emanuel by advocating good patient care. She did not abuse her duty as a nurse by advocating the needs of her patients. Patient advocacy by a nurse does not necessarily remove one from the protection of Sec. 2000e-3.
 
 
 36
 Having concluded that Wrighten's activities did not exceed the protection of Sec. 2000e-3, we return to the method of analysis set forth earlier for evaluating claims of retaliatory discharge. The trial court found that Wrighten was successful in shifting the burden of production to Emanuel to articulate some legitimate, nondiscriminatory reason for her termination. The trial court held that Emanuel articulated legitimate nondiscriminatory reasons for terminating Wrighten and that Wrighten did not succeed in showing that Emanuel's proffered explanation was mere pretext. We must conclude, in light of the record, that this holding is clearly erroneous.
 
 
 37
 Wrighten was fired by Emanuel's president himself, at the height of controversy over the quality of black patient care at Emanuel and in the midst of upsetting organizational changes in nursing at the hospital. President Larson testified at trial that it was "highly unusual" for him to take personnel actions directly and that he could not recall personally terminating anyone at the hospital in the two years before he terminated Wrighten. He testified that prior to March 1, 1976, he was not aware of either Wrighten or Graham, and that he knew of no problems with either of them. He admitted that except for the events between March 1 and March 11, 1976, he knew of nothing to justify the suspension of Graham and suspected the same was true of Wrighten. He testified that he perceived Wrighten as the "leader" of the protest over black patient care.
 
 
 38
 One of the reasons Larson gave for Wrighten's termination was her "generally poor work performance." The record, however, indicates that Wrighten received only one reprimand prior to calling the press conference: in 1975 she failed to call in early enough on a day when she was home sick. After the press conference she was criticized by her supervisor for too many personal phone calls and for meetings in the hallway. The trial court found that these interruptions probably were related to issues raised by the press conference. No evidence was introduced that Wrighten continued to receive calls or have hallway meetings after she was told not to. Emanuel never claimed that she refused or failed to do her work during this episode.
 
 
 39
 The second reason for Larson's decision to terminate Wrighten was her failure to cooperate with the committee he appointed. Larson suspended Wrighten with pay from her nursing duties, denied her access to the hospital grounds and ordered her to work with the committee. Larson claimed it was a "fact finding" committee. Its chairman, however, testified that it was not clear to him what the committee was to do and that he never felt it was the committee's role to investigate charges of discrimination at the hospital. He thought the committee was to act as an "intermediary" between "two groups." Wrighten testified that she was unclear as to the role the committee was to play. She thought it was to contact her with questions about her allegations and claims that is why she did not go to it with specific information. The status of the committee is also confused by Larson's testimony that he also instructed members of the hospital staff to investigate Wrighten's complaints. He made no memorandum record of the instructions and his testimony at trial was unclear as to whom he instructed to investigate what.
 
 
 40
 In arriving at his conclusion to terminate Wrighten, Larson testified that he consulted several persons, including his so-called fact-finding committee. The committee chairman testified that he was reluctant to suggest that Wrighten be reinstated following her suspension because he did not think her situation at the hospital had been resolved. Wrighten had no knowledge when she was suspended that the committee would be called upon to make personnel recommendations. President Larson's asking it to do so reinforces Wrighten's allegation that it was "Larson's committee" all along. As emphasized at oral argument, ethnic or minority employees frequently are suspicious of committees appointed by white employers to investigate their grievances, no matter what the composition. Because a suspension, even with full pay, typically is considered a disciplinary measure, Wrighten had additional grounds for suspicion. Given Larson's unclear mandate to the committee, his own testimony that he also instructed hospital staff to investigate Wrighten's claims, and that he apparently intended to use the committee to make personnel decisions, we conclude that Wrighten's failure to cooperate with the committee did not constitute a legitimate, nondiscriminatory reason for her termination.
 
 
 41
 The final reason Larson gave for terminating Wrighten was her "general insubordination." This criticism did not surface until after the press conference at which she alleged poor black patient care at the hospital. By advocating the proper care of her patients, however, Wrighten was fulfilling her duty as a nurse. Patient advocacy by a nurse is not insubordination. Larson perhaps believed that Wrighten was insubordinate because he was upset by her allegations and her refusal to be specific about her complaints. Perhaps he felt her abrasive personality to be insubordination.
 
 
 42
 We are not persuaded that Wrighten's "general insubordination" was a legitimate ground for termination, however. The trial court noted that a potential for tension and lack of communication existed in 1976 at Emanuel due to changes in hospital routine and practice, as well as for general social and economic reasons. Wrighten reacted to a situation that the trial judge found to be "unusual." In evaluating witnesses the trial court noted that Wrighten was not the only employee with an abrasive personality. The court said of Weleber, Wrighten's supervisor, that she was "given to a terse and concise manner of expression, even to the point of brusqueness. Such an approach to subordinates might well cause confusion, especially in light of the rather fundamental changes in duties then being implemented."
 
 
 43
 On the record before us, we are persuaded that Wrighten would not have been terminated when she was if she had not engaged in activities protected by Sec. 2000e-3. Kauffman v. Sidereal Corp., 695 F.2d at 345. Despite conflict in the testimony and the inartful presentation of plaintiffs' case, a preponderance of the evidence indicates that Emanuel Hospital retaliated against her for engaging in activity protected by 42 U.S.C. Sec. 2000e-3.
 
 ASSESSMENT OF COSTS
 
 44
 The district court assessed defendants' costs of the suit against plaintiffs in the amount of $7,397.95.[7] Plaintiffs argue that the assessment was unwarranted because they have limited financial resources and the assessment has the effect of penalizing them for bringing this action. They ask that the rationale for awarding attorneys' fees be extended to costs awards. In Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), the Supreme Court held that "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." Id. at 422, 98 S.Ct. at 700. Title VII gives a district court discretion in allowing attorneys' fees to the prevailing party. Id. at 416, 98 S.Ct. at 697. We need not determine the precise limits of Christiansburg here. Cf. Poe v. John Deere Co., 695 F.2d 1103 (8th Cir.1982) (refusing to extend Christiansburg to costs assessments.)
 
 
 45
 Costs are awarded to the prevailing party in civil actions as a matter of course, unless otherwise directed by an express statutory provision, unless the district court directs otherwise. National Organization of Women v. Bank of California, 680 F.2d 1291, 1294 (9th Cir.1982). An appellate court will uphold the award unless it reflects an abuse of discretion. Id. The district court did not have the benefit of our National Organization of Women holding that limited financial resources of a plaintiff may be considered when making costs awards. Id. Plaintiffs in this case may have multiplied costs unnecessarily because of the conduct of their counsel. In light of our conclusion that Wrighten should have prevailed on the issue of retaliatory discharge, however, the trial court must reassign a portion of the costs. It may also consider the losing plaintiffs' limited financial resources when reassessing the costs award.
 
 
 46
 Affirmed in part, reversed in part, and remanded for reassessment of costs for plaintiff Wrighten.
 
 
 
 [1]
 The trial court's opinion addressed only Title VII. The standards under Sec. 1981 are more stringent than those of Title VII. Hence when a plaintiff fails to meet its burden of proof under Title VII, it also fails to establish a claim under Sec. 1981. Contreras v. City of Los Angeles, 656 F.2d 1267, 1271 n. 2 (9th Cir.1981). See also, Craig v. County of Los Angeles, 626 F.2d 659, 668 (9th Cir.1980), cert. denied, 450 U.S. 919, 101 S.Ct. 1364, 67 L.Ed.2d 345 (1981)
 
 
 [2]
 The record contains numerous references to "the black community" or, more often, "the community" as a shorthand reference to local ethnic groups and activities
 
 
 [3]
 It is now firmly established that the timely filing of a discrimination charge with the EEOC is not a jurisdictional prerequisite to suit in federal court. Rather, it is a prerequisite that is subject to waiver, estoppel and equitable tolling. Zipes v. TWA, Inc., 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1003 (11th Cir.1982); Pinkard v. Pullman-Standard, 678 F.2d 1211, 1215 (5th Cir.1982)
 
 
 [4]
 The local rule requiring the Rule 23 motion to be filed within 60 days of the commencement of the action appears to be of dubious value in light of the frequent delays in discovery in complex cases. However, appellate disapproval under the present circumstances is not warranted since counsel made no record of inability to comply with the local rule and did not seek relief from its application by way of a request for additional time
 
 
 [5]
 Section 2000e-3 is silent on the issue of racial motivation. Cf. 42 U.S.C. Sec. 2000e-2, which does address racial motivation in employer discharge decisions. The trial court found that Wrighten's termination was not racially motivated. We are puzzled by this finding since racial motivation is not at issue under Sec. 2000e-3
 
 
 [6]
 The Ninth Circuit has cited Hochstadt in Silver and on one other occasion for the proposition that an employer has an interest in maintaining a harmonious and efficient operation. In Smith v. Singer Co., 650 F.2d 214 (9th Cir.1981) we upheld termination against a Sec. 2000e-3 challenge, citing Hochstadt for the proposition that there is a difference between protected and unprotected employee conduct under the statute. 650 F.2d at 216. In that case Smith denied that he had been filing complaints of discriminatory practices against his employer when in fact he had been. It was Smith's job to develop an affirmative action program for Singer, which he was incapable of doing given the adversarial position in which he placed himself with his employer. Id. at 216. Wrighten never concealed her complaints against Emanuel and did not have a job assignment that conflicted with her filing of these complaints
 
 
 [7]
 These costs do not include attorneys' fees. The district court required each party to pay its own attorneys' fees