Carlos BENITEZ, Plaintiff,

v.

PORTLAND GENERAL ELECTRIC, an Oregon Corporation, Defendant.

No. CV 91–864–PA.

United States District Court,
D. Oregon.

May 13, 1992.

---

Gordon L. Osaka, Portland, Or., for plaintiff.

Corbett Gordon, Kathryn M. Hindman, Bullard, Korshoj, Smith & Jernstedt, Barrie J. Herbold, Lisa A. Kaner, Markowitz, Herbold, Glade & Mehlhaf, P.C., Portland, Or., for defendant.

## AMENDED OPINION

PANNER, District Judge.

Plaintiff, Carlos Benitez, brings this action against his employer, Portland General Electric, alleging race, color, and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), and ORS 659.030.

These are my findings of fact and conclusions of law after the court trial. Fed. R.Civ.P. 52(a). I conclude that plaintiff has not proved that he was subjected to discrimination in employment.

## FINDINGS OF FACT

I. PLAINTIFF'S EMPLOYMENT WITH DEFENDANT.

Plaintiff is a Hispanic–American of Puerto Rican origin. He commenced employment with defendant in September 1979. At all times relevant to this action, plaintiff was covered by a 1990 collective bargaining agreement between defendant and the International Brotherhood of Electrical Workers, Local 125 (IBEW or the union), which established the terms and conditions of his employment.

A. *Defendant's hostile work environment.*

During much of the 1980s, defendant did not provide a discrimination-free working

environment for its minority employees. Many minority employees, particularly those who were assigned to defendant's work crews, were subjected to a barrage of racial slurs and verbal abuse. Much of the name-calling appears to have been a form of hazing for newer employees and, for this reason, the practice was generally tolerated. Whether intended as hazing or otherwise, however, the practice fostered an atmosphere of hostility and racial intolerance.

Plaintiff, like many other minority employees, was often the target of racial insults at the work site. In the early 1980s, while working on defendant's work crews, plaintiff was called names such as "beaner," "greaser," and "Porta–Gar" (meaning Puerto Rican-nigger). Jim Kloch, at that time a crew foreman, made such remarks regularly in 1981 and 1982.

In 1988, defendant implemented a program to identify and eliminate discriminatory practices in the workplace. In early 1990, defendant launched a separate program to handle problems arising from cultural diversity in its workforce. The incidence of racial harassment appears to have diminished as a result of defendant's efforts. In the late 1980s, whether as a result of defendant's EEO program or other reasons, racial remarks directed at plaintiff became infrequent. Jim Kloch, with whom plaintiff worked closely as a relief dispatcher, made no references to plaintiff's race or national origin after 1984.

There is sparse evidence of racial harassment at defendant's workplace since the late 1980s. The only racial remark directed at plaintiff during this period was made by Mike Chapin who, in 1991, referred to plaintiff as a "taco bender." At the time the remark was made, plaintiff did not believe it was intended as a racial insult.

B. *The relief and full-time repair dispatcher positions.*

In September 1989, plaintiff applied for and obtained a position as a relief repair dispatcher. The relief repair dispatcher position was filled in accordance with the bidding procedure established under the collective bargaining agreement. The decision to award the job to plaintiff was made by Leroy Johnson, general foreman of the line department at defendant's Portland Service Center, and Mike Chapin, defendant's construction coordinator. Plaintiff received the job even though Randy Bryson, a white male with less seniority than plaintiff, was better qualified for the position.

In August 1990, plaintiff applied for a position as a full-time repair dispatcher. The filling of the full-time position was governed by the bidding procedure established under the collective bargaining agreement. Plaintiff was fourth in seniority among the applicants for the position and, therefore, his application was not considered. Instead, three employees senior to plaintiff, Cliff Altman, Doug Honeycutt, and John Hamalainen, were interviewed for the full-time position. The job was awarded to Honeycutt, a white male.

The decision to promote Honeycutt was made by Leroy Johnson, with the input of Mike Chapin and Jim Kloch, at that time plaintiff's supervisor. Defendant acknowledges that plaintiff was better qualified for the full-time position than either Altman, Honeycutt or Hamalainen. Defendant also acknowledges that Altman, although eligible to bid, would not have been hired for the full-time position because he was under disciplinary action at the time the opening was filled.

In February 1991, plaintiff filed a grievance alleging that defendant's decision to fill the full-time position with Honeycutt violated the labor agreement. On April 16, 1991, the union notified plaintiff that the grievance lacked merit and would not be arbitrated. Plaintiff sought review before an internal union executive board, but was unsuccessful.

C. *Plaintiff's complaint concerning sharing of overtime.*

Following plaintiff's appointment to the relief repair dispatcher position, one of the full-time dispatchers left defendant's employ. Plaintiff filled the position on a temporary basis until it was bid in August

1990. During his stint as a regular dispatcher, plaintiff was permitted to share overtime with defendant's full-time dispatchers.

After the available full-time position was filled by Honeycutt and plaintiff had returned to the relief position, plaintiff told Jim Kloch that he wanted to continue sharing overtime with the regular dispatchers. In January 1991, Kloch assembled the four regular dispatchers and asked them to vote on whether they wished to share overtime with plaintiff. The votes were split at two-to-two, and Kloch cast the deciding vote against sharing overtime with plaintiff. Kloch explained that the sharing of dispatcher overtime with the relief dispatcher was contrary to defendant's past practice. Plaintiff acknowledges that his request to share in the regular dispatcher's overtime represented a departure from past practice, and that his predecessors in the relief position had not been allowed to share overtime. Plaintiff did not file a grievance regarding the overtime issue.

D. *Plaintiff's grievance concerning shift rotation.*

On June 19, 1991, plaintiff filed a grievance alleging that defendant had on two occasions improperly rotated another employee into the relief repair dispatcher position. Defendant responded that it was necessary to train additional personnel in the relief position to ensure proper staffing. The union declined to process plaintiff's grievance and accepted defendant's proposed ground rules for rotating other personnel into plaintiff's position.

II. THE COLLECTIVE BARGAINING AGREEMENT.

Article 16 of the CBA establishes detailed rules for the filling of vacant positions within the bargaining unit, including the full-time position sought by plaintiff. Under Article 16.5, decisions regarding job assignments depend on factors such as the

employee's timely submission of an application during a specified posting period, the employee's relative seniority, and the employee's qualifications. Article 16.5.4 specifies that open positions must be filled by "one of the three employees highest on the seniority list."

CONCLUSIONS OF LAW

Plaintiff seeks relief under Title VII and ORS 659.030 under theories of discriminatory failure to promote, discriminatory retaliation, and hostile work environment. The evidence does not support plaintiff's allegations of discriminatory treatment.

I. DISCRIMINATORY FAILURE TO PROMOTE.

The parties agree that plaintiff must establish disparate treatment by means of the prima facie analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under the *McDonnell Douglas* analysis, plaintiff must first establish a prima facie case of race, color or national origin discrimination. If he can do so, defendant must articulate a legitimate, non-discriminatory reason for its conduct to rebut the presumption created by the prima facie case. If it succeeds, plaintiff must prove that the articulated reason is merely a pretext to conceal unlawful discrimination. Although the burden of production shifts under this analysis, the burden of proof remains at all times upon the plaintiff. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.[1]

In a case involving an allegedly discriminatory promotion decision, a prima facie case consists of four elements: (1) the *plaintiff is a member of the statutorily* protected class; (2) the plaintiff sought a promotion for which he was qualified; (3) the plaintiff was denied the promotion; and

---

**1.** I note that the statutory scheme established by ORS Chapter 659 was intended to "imitate" Title VII, and that cases arising under Title VII are instructive regarding the interpretation of Oregon anti-discrimination laws. *See, e.g., Holien*

*v. Sears, Roebuck & Co.*, 298 Or. 76, 99, 689 P.2d 1292 (1984). I have, therefore, applied the *McDonnell Douglas* burden shifting analysis to plaintiff's claims of discrimination under ORS 659.030.

(4) the promotion was awarded to an employee outside the protected class. *Pejic v. Hughes Helicopters, Inc.,* 840 F.2d 667, 672 (9th Cir.1988).

Plaintiff alleges that he was passed over for a promotion in favor of a white employee, notwithstanding that plaintiff was better qualified for the position. Plaintiff has therefore established a prima facie case of discrimination.

■ I find that defendant has successfully rebutted the presumption created by plaintiff's prima facie case. Defendant submits that its decision to promote Honeycutt to the full-time position was mandated by Article 16.5.4 of the collective bargaining agreement. Defendant's contention is consistent with the testimony of Bud Bailey, defendant's former manager of labor and employee relations, and James Cox, IBEW's business representative. Both witnesses testified that the labor contract required the company to promote the best qualified employee from among the three most senior bidders. Based on my reading of the contract provision and the evidence presented at trial, I conclude that defendant's actions were based on a reasonable interpretation of its obligations under the labor agreement.[2]

■ Because defendant has presented a legitimate business justification for its treatment of plaintiff, I must now proceed to the final step of the *McDonnell Douglas* analysis. Plaintiff must prove that defendant's stated reason for the promotion decision was a pretext intended to disguise unlawful discrimination. Plaintiff has not met his burden.

The evidence establishes that, whatever discrimination plaintiff may have suffered on defendant's work crews in the early 1980s, he encountered no discrimination in his bid for the full-time dispatcher position. As evidenced by the testimony of Jim Kloch, defendant regarded plaintiff as highly qualified for the full-time position. But for the bidding procedure established by the collective bargaining agreement, it is probable that plaintiff would have received the promotion. Plaintiff has neither shown that defendant's interpretation of the agreement was unreasonable, nor that defendant elected to abide by the agreement solely for the purpose of legitimizing a discriminatory decision. The testimony of Bud Bailey and James Cox, the individuals most familiar with the labor contract, establishes that defendant had no discretion to ignore the bidding requirements of the agreement. I further observe that, if defendant had been free to disregard the contract's bidding procedures, it would not have adhered to those procedures in 1989, when it awarded the relief dispatcher position to plaintiff over Bryson.

Finally, there is no indication that the individuals who participated in the promotion decision, Leroy Johnson, Mike Chapin, and Jim Kloch, were swayed by discriminatory considerations. Evidence of Kloch's harassing conduct in the early 1980s and Chapin's isolated reference to plaintiff's race are insufficient to establish discrimination in the promotion decision. In addition, plaintiff presented no evidence that Leroy Johnson, defendant's principal decision-maker, acted with discriminatory intent in denying plaintiff the full-time position. Johnson relied solely on legitimate business considerations in awarding the promotion to Honeycutt.

Plaintiff relies heavily on the fact that Cliff Altman, one of the three applicants for the full-time position, was under disciplinary action at the time of the interviews and would not have been awarded the promotion. Although I am persuaded that defendant would not have selected Altman for the job, defendant reasonably believed that Altman's disciplinary status did not disqualify him from the bidding process under the labor agreement. Jim Kloch

2. Defendant's contention that it believed itself obligated to select the full-time dispatcher from among the three most senior bidders is further corroborated by defendant's past practice. Defendant complied with the bidding procedures of Article 16.5.4 in September 1989, when it awarded plaintiff the relief repair dispatcher position. Plaintiff received the promotion even though the fourth man on the seniority list, Randy Bryson, was better qualified. Plaintiff acknowledges that Bryson was better qualified for the relief dispatcher job.

gave Altman an opportunity to withdraw from the bidding process, but Altman declined to do so. Thereafter, defendant felt itself obligated to include Altman in the three-employee applicant pool mandated by Article 16 of the labor agreement. I am satisfied that defendant interpreted its obligations under the agreement reasonably and in good faith.

Based on the evidence, plaintiff has not established discrimination in the promotion decision. Plaintiff's claim of discriminatory failure to promote under Title VII and ORS 659.030 is without merit.

## II. RETALIATION.

A prima facie case of Title VII retaliation consists of the following elements: (1) the plaintiff was engaged in a protected activity; (2) the plaintiff was thereafter subjected to adverse treatment by the defendant; and (3) a causal nexus between the protected activity and the adverse treatment. *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346, 1354 (9th Cir.1984).

 In February 1991, plaintiff filed a grievance challenging the allegedly discriminatory promotion decision. Plaintiff also complained to Jim Kloch. Plaintiff claims that, in retaliation for his complaint of discrimination, Kloch excluded him from sharing overtime with the full-time dispatchers and began rotating other employees into the relief position. These allegations are sufficient to state a prima facie case of retaliatory discrimination. Nevertheless, plaintiff cannot sustain his burden of proof on his retaliation claims.

Plaintiff has not established a causal nexus between his complaint about the promotion decision and Kloch's decision to exclude him from sharing overtime. Initially, I observe that the dispatchers met and voted on the overtime issue in January 1991, the month before plaintiff filed his grievance over the promotion. This fact, without more, is sufficient to defeat plaintiff's allegations of retaliation. Even apart from this timing problem, however, plaintiff has not presented any evidence that Kloch acted with a discriminatory motive. In seeking to share in the overtime, plain-

tiff was requesting a departure from defendant's past practice. Given that the regular dispatchers were evenly divided as to whether they wished to share their overtime with plaintiff, Kloch's vote in favor of the existing practice was reasonable. There is no evidence that Kloch's vote was linked to plaintiff's grievance.

Similarly, plaintiff has not established a nexus between his discrimination complaints and defendant's decision to rotate another employee into plaintiff's relief position. Defendant's action was based on a legitimate need to train back-up personnel for the relief position. Representatives of IBEW, Local 125 agreed that defendant's actions were appropriate. Defendant has therefore presented a valid business justification for its handling of shift rotation. There is no evidence that defendant's stated reason is pretextual. Because there is no causal connection between plaintiff's discrimination complaint and the shift rotation issue, I must reject plaintiff's allegations of reprisal.

## III. HOSTILE ENVIRONMENT DISCRIMINATION.

Plaintiff alleges that he was called names such as "beaner" and "greaser" during the course of his employment. He alleges that other minority employees of defendant were also subjected to degrading and insulting racial epithets. Plaintiff contends that this practice was sufficiently pervasive to constitute a hostile environment in violation of Title VII and ORS Chapter 659.

 To state a claim of hostile environment discrimination, plaintiff must establish that he was subjected to racial harassment "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)). Isolated comments or sporadic incidents of harassment, without more, will not support a hostile environ-

ment claim. *Id.* To obtain relief, plaintiff must establish a violation of Title VII or ORS 659.030 within the limitations period applicable to each statute. 42 U.S.C. § 2000e–5(e) (establishing a Title VII limitation period of no more than 300 days); ORS 659.121(3) (establishing a one year limitation period for ORS 659.030).

Plaintiff has produced abundant evidence that racial hostility against minority employees permeated defendant's workplace during the early 1980s. It is unfortunate that plaintiff was forced to endure such pervasive workplace harassment. Had plaintiff filed a timely complaint challenging defendant's discriminatory treatment of minorities, he might well have obtained relief. Nevertheless, I must evaluate plaintiff's hostile environment claim based on the conditions maintained in defendant's workplace during the applicable limitations period. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977).

There is sparse evidence of widespread racial harassment at defendant's workplace since the early 1980s. Mike Chapin's reference to plaintiff as "taco bender" was the only racial comment directed at plaintiff since plaintiff became a relief repair dispatcher in 1989. Further, although plaintiff testified about isolated racial comments directed at other employees during the past few years, I am satisfied that the atmosphere of discrimination which characterized defendant's workplace in the early 1980s has abated significantly. Based on the limited evidence of race discrimination during the limitations period, I conclude that the harassment complained of by plaintiff was not sufficiently severe or pervasive to rise to the level of a hostile work environment. Plaintiff has not established a violation of Title VII or ORS 659.030.

## CONCLUSION

Plaintiff has not proved that he was subjected to discrimination in employment in violation of Title VII or ORS 659.030.