111 F.3d 138
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Victoria L. TRENT, a/k/a Victoria L. Winebarger, Plaintiff-Appellant,
v.
VALLEY ELECTRIC ASSOCIATION, INC., Richard Burasco; Ross
Dohlen; Kenneth Tankersley; I C "Oakey" Spears;
Harry Johnson; Dan Peterson, Does
XXI-XXX, Defendants-Appellees.
 No. 95-16722.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 9, 1996.
Decided April 18, 1997.
 
 Before: FLETCHER, WIGGINS, and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Victoria Trent ("Trent") appeals an adverse judgment following a bench trial in her action for retaliatory discharge under § 704 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), against her employer, the Valley Electric Association ("VEA"). The district court found that Trent failed to prove that she was discharged in retaliation for her protected activity and entered final judgment for VEA. In so ruling, the district court improperly disregarded Trent's circumstantial evidence of retaliation. We therefore remand for a new trial.
 
 A. Standard of Review
 
 3
 We review the judge's findings of fact under the clearly erroneous standard, Magnuson v. Video Yesteryear, 85 F.3d 1424, 1427 (9th Cir.1996). An appellate court must accept the lower court's findings of fact unless upon review the appellate court is left with the definite and firm conviction that a mistake has been committed. Sawyer v. Whitely, 505 U.S. 333, 346 n. 14 (1992). We review the district court's conclusions of law de novo. Magnuson, 85 F.3d at 1427.
 
 B. Facts
 
 4
 Trent worked for VEA from February 8, 1988 to September 19, 1988. She alleges that she was terminated by VEA because she complained about inappropriate remarks, including foul language and a series of sexually offensive references, made at a July 20, 1988 safety meeting conducted by Ruralite Services, Inc., a company often hired by VEA to train its employees. She was required to attend this meeting.
 
 
 5
 VEA is an electric utility company providing electrical services to small towns and rural areas in Nevada, including the Pahrump Valley, a remote area north of Las Vegas. VEA's revenues are derived from the payment of monthly power bills by its customers. VEA must obtain readings from each customer's power meter in order to generate its bills. Since 1985, VEA has employed Jack Winebarger ("Winebarger"), as an independent contractor to read the 3500 meters in the Pahrump Valley each month. Although he generally employs 1-3 employees to help him read the meters, he is the only person who knows the location of all the meters. In 1987 one of VEA's employees, Mark Hatfield, who had been working with Winebarger to read the meters as VEA's in-house reader, was injured. Trent was hired to replace Hatfield as VEA's in-house meter reader; she already knew the location of many of the meters because she had read them while working for Winebarger as one of his contract employees. Trent and Winebarger had lived together since the 1980's, a fact known to VEA at the time she was hired. She was the first woman ever employed by VEA in other than clerical jobs. In addition to meter reading, she had other substantial duties.
 
 
 6
 Trent worked for VEA for seven months. During that time she received good employment evaluations. On August 19, 1988, she complained to her immediate supervisor, Richard Burasco, about inappropriate sexual remarks and jokes that were made at the July 20 safety meeting that she had attended. Burasco asked her to put her account of the incident and corresponding complaints in writing so that formal documentation could be forwarded to VEA's general manager Ross Dohlen. Trent did so the next day, and briefly discussed the matter with Dohlen.
 
 
 7
 On September 19, 1988, after the meters were read for that month's billing cycle, Trent was fired. Burasco advised Trent that she would have to resign or she would be terminated. She resigned, then retracted her resignation. She was terminated over the protest of Burasco, on orders from Dohlen, who asserted that her residency with Winebarger created an unacceptable risk to VEA. After resigning, Trent met directly with Dohlen and asked to be reinstated. He refused. On September 30, 1988, Trent attended a meeting of VEA's Board of Directors and sought reinstatement. At that meeting, Dohlen advised the Board that he believed Trent's employment presented VEA with an unnecessary and unacceptable risk. In spite of the presence of 20 consumers who protested her termination and the fact that the directors were told that she was a model employee, she was not reinstated.
 
 
 8
 Upon hearing of Trent's termination, Winebarger offered to give up his meter-reading franchise so that Trent could retain her job, and its attendant benefits. VEA refused his offer. In fact, on September 7, 1988 it had signed its first written contract with Winebarger, one that contained no protection against the threat that Dohlen felt was unacceptable--Winebarger's monopoly on meter-reading expertise.
 
 
 9
 VEA replaced Trent with another in-house meter reader, Randy Nolan. For approximately 10 months he read a rotating selection of the meter routes in the Pahrump Valley. His position was then phased out, because he read the meters too slowly, and Winebarger regained sole responsibility for reading the meters. When Trent was hired in 1988, VEA had begun a mapping program that would have documented the location of the meters. This map was incomplete as of 1994.
 
 C. Analysis
 
 10
 After Trent's presentation of her case in chief the district court granted VEA's motion for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. The court concluded that Trent had failed to maintain her burden of proof on an essential element of her claim: that there was a causal link between her complaint about the safety meeting and Dohlen's decision to terminate her. Instead, the court found that VEA had terminated Trent for a legitimate, non-retaliatory reason, that control of VEA's meter reading duties was unacceptably concentrated in one household, and entered final judgment in favor of VEA.
 
 
 11
 After a thorough review of the record in its entirety, we conclude that at the juncture that the district court dismissed the case, were the circumstantial evidence considered by the court, Trent's evidence of retaliatory firing would seem to compel a judgment in her favor. However, the record is incomplete: as a result of the judgment on partial findings, VEA never had the opportunity to put on its case. On retrial, Trent's evidence, both direct and circumstantial, must be considered by the court and balanced against whatever evidence VEA may adduce.
 
 
 12
 In Title VII retaliation cases, once the plaintiff has established a prima facie case,[1] the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its decision. Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.1987). Once the defendant meets this burden, the burden of production then shifts back to the plaintiff to show that the alleged explanation is a pretext for impermissible retaliation. Id. Since we are reviewing a retaliatory discharge claim after a bench trial, the critical issue is whether the district court erred in holding that the appellant had not met her burden of proving that a retaliatory reason more likely than not motivated VEA. Miller v. Fairchild Industries, Inc., 885 F.2d 498, 504 n. 4, cert. denied, 494 U.S. 1056 (1990) (citing U.S. Postal Service B. of Governors v. Aikens, 460 U.S. 711, 714 (1982)).
 
 
 13
 This is not a case of our simply disagreeing with the district court as to the way the evidence should be weighted. Rather, the district court appeared to be under the misimpression that to prevail Trent had to present direct evidence that VEA's motive for firing her was discrimination and he also discounted considerable circumstantial evidence as irrelevant. The court's error is evidenced by its finding that Trent failed to present "direct evidence that Dohlen possessed any improper animus when he decided to terminate Trent." Findings at 8 (emphasis added), and its several remarks that certain evidence was irrelevant. Direct evidence is not required. Discrimination may also be shown indirectly, by showing through circumstantial evidence that the employer's proffered explanation is pretextual.
 
 
 14
 Wrighten v. Metropolitan Hospitals, Inc., 726 F.2d 1346, 1354 (9th Cir.1984) (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981). Indeed, pretext is almost always proved by indirect evidence.
 
 
 15
 We do require that circumstantial evidence of pretext be specific and substantial, consisting of more than a mere refutation of the employer's legitimate reason and that the discriminatory reason be the cause of the firing. Wallis v. J.R. Simplot, Co., 26 F.3d 885, 890 (9th Cir.1994) (citing Steckl v. Motorola Inc., 703 F.2d 392, 393 (9th Cir.1983)). Trent's evidence was specific and it was substantial.
 
 
 16
 Nothing in the record supports VEA except the self-serving statement that it needed a reader independent of Winebarger. All of their actions were to the contrary. "[R]ejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination, and ... no additional proof of discrimination is required." St. Mary's Honor Center v. Hicks, 509 U.S. 511 (1993) (quotation omitted, emphasis in original). With this in mind we have examined all of the evidence in the record.
 
 
 17
 Dohlen and Burasco changed their testimony after the first remand from this court. The district court believed that they were essentially truthful witnesses and that they simply had been wrong in their first affidavits when they asserted at trial that their decision to fire Trent was made in mid-August, rather than mid-September. We must accept its finding in this regard.
 
 
 18
 Causation may be inferred from evidence showing that the adverse action occurred shortly after the protected activity. See Miller, 885 F.2d at 505. Trent made her complaint in mid-August of 1988. She was fired in mid-September. Crediting the district court's determination that Dohlen and Burasco were truthful in asserting that the decision to fire Trent was made the day before she was fired, the two events were still in close enough proximity to infer a causal relationship between Trent's complaint and her termination. This change in timing does not alter the strength of Trent's argument as to the cause of her firing. She was fired the day after the monthly meter reading cycle was completed in the Pahrump Valley, September 18, 1988. ER, tab 5 (letter to NERC, April 7, 1989, signed by both Dohlen and Burasco). It is consistent with the evidence that VEA wanted her competent services until that essential chore was completed: "It was after that work was completed that the action was taken to terminate Ms. Trent. It was not taken earlier as it would have hindered the meter reading process as it would have been one employee short." Id.
 
 
 19
 Causation may also be inferred from the fact that management personnel engaging in an adverse employment decision are aware that the employee has engaged in protected conduct. Id. Both Dohlen and Burasco testified at trial that they were aware that Trent had made her complaint by August 19, 1988, when her written complaint was submitted, one month before she was fired.
 
 
 20
 Pretext can be shown by the inconsistent application of employer policy, Cohen v. Fred Meyer, Inc., 686 F.2d 793, 797 (9th Cir.1982). VEA management was aware of Trent's relationship with Winebarger before she was hired. In fact, she was hired in part because she already knew the location of many of the meters in Pahrump Valley as a result of accompanying Winebarger on his routes, and eventually in reading the meters as his contract employee. At trial, VEA offered absolutely no reason why this asset suddenly turned into an unacceptable liability.
 
 
 21
 Trent testified that Burasco knew of her relationship with Winebarger when he hired her in February, 1988, TR 191, and that he discussed VEA's nepotism policy with both Trent and Winebarger at that time, TR 199, but did not believe their relationship would be a problem under the policy unless they married. Burasco, himself, testified that he discussed this with Dohlen at that time, "[o]r he wouldn't have allowed me to hire." TR 201. Trent, too, testified that Burasco specifically told her when she was hired that her relationship with Winebarger had been discussed prior to VEA offering her the position and that it would not be a problem. TR 262. Neither Burasco or any other witness denied this.
 
 
 22
 Burasco also testified that Trent was a good employee and that he was concerned when he fired her because "I think we live in a day and age that you don't just fire a good employee that is performing their job." TR 217. Herb Cochrell, VEA's computer service coordinator and payroll administrator, testified that in the fourteen years that he had worked at VEA no employees had ever been terminated whose work had been satisfactory. TR 71.
 
 
 23
 No testimony was offered at trial to explain why Trent's relationship with Winebarger suddenly became a problem in September of 1988. Dohlen simply testified that although Trent was a good employee, TR 117; TR 148, it "became apparent in August of 1988" that her relationship with Winebarger presented an unacceptable risk to VEA. Dohlen identified no incident or incidents that triggered this decision. TR 111. He stated that he considered no alternatives to termination, TR 117, or made any other offer of employment to Trent at VEA, TR 143, that there were no women employed at VEA in non-clerical positions, and that Trent was the only employee that he terminated at VEA whose work was satisfactory. TR 117.
 
 
 24
 Dohlen also testified that Trent's six-month performance evaluation, completed two to three weeks prior to her complaint, made no notation of any concerns with respect to covering VEA's meter reading responsibilities in the Pahrump Valley, TR 139.
 
 
 25
 Burasco testified that he and Dohlen had represented to Mr. De Jesus, the Equal Opportunity Representative for the state of Nevada, that the relationship between Winebarger and Trent had not been an issue in her termination and that it was known to VEA before and during her employment. TR 219; ER Tab 5. He stated that he believed that Dohlen would not hire her back because "once he makes a decision about something, he normally didn't reverse it." TR 229.
 
 
 26
 Trent's uncontested testimony was that meter reading was only a small part of her job (4 days per month); her other duties consisted of collections, disconnecting and connecting meters, and ordering office supplies. She stated that she trained her replacement for VEA, that she continued to read the meters with Winebarger until 1991, and that VEA did not maintain any in-house capability for meter reading after her termination, but that in fact, Winebarger continued to retain all meter reading expertise. TR 265-267. She was not offered any other position at VEA.
 
 
 27
 VEA's conduct was inconsistent, too, in its supposed commitment to eliminating their vulnerability: they made no contractual provisions to protect themselves; they did not maintain an in-house meter-reading capability; and they did not complete a mapping project that would have documented the locations of the meters in question.
 
 
 28
 Winebarger testified that at the time of trial, all meters were being read by him and that VEA had no in-house readers. TR 153. He testified that the in-house employee hired to replace Trent stopped reading meters after less than a year because he was too slow. TR 156. He testified that immediately after Trent was fired, he offered to Dohlen to quit his contract if Dohlen would reinstate Trent because she needed the job to support her kids, but that Dohlen "had already made up his mind." TR 159. He testified that Burasco told him that Trent was supposed to have been fired a month before she was actually fired (which would have been mid-August, immediately after Trent complained about the remarks made at the safety meeting). TR 160. And he testified that nothing in the contract that he signed with VEA on September 7, 1988 protected VEA from any of the dangers that they claimed motivated Trent's dismissal on the 19th, such as a guarantee that Winebarger would train a replacement should he decide to terminate the agreement. TR 172.
 
 
 29
 Burasco testified that VEA was developing a mapping system which would have documented the location of the meters, that this project was in progress in 1988 when Trent was hired, that Dohlen knew about it, and that it still wasn't completed in 1994. TR 236-237.
 
 
 30
 VEA's assertion that its main concern was maintaining an in-house meter-reading capability, is undermined by the fact that they knew of her relationship with Winebarger before her hire in February, did not identify any changed circumstance that made such a relationship a threat in September, did not maintain such a capability after her termination, did not negotiate any protection from Winebarger's monopoly of that information in their September, 1988 contract (their first written contract with him), did not agree to take the project entirely in-house when Winebarger offered to give up his franchise, did not complete their internal mapping project that would document the location of the meters, and did not offer Trent, an admitted good employee, any alternative employment despite the fact that meter-reading was only a small part of her job description. The evidence adduced to the moment of dismissal leads us to conclude that no inference was possible at that juncture other than that VEA used Trent's relationship with Winebarger as a pretext for termination in retaliation for Trent's August, 1988 complaint.
 
 D. Conclusion
 
 31
 The district court concluded that "[w]hatever risk Valley Electric assumed when it hired Trent, Dohlen's testimony established that he reconsidered that risk and decided that its continued existence was unacceptable and needed to be reduced." However, not one scintilla of evidence in the record suggests that Dohlen's "reconsideration" was prompted by any event, internal or external, other than Trent's complaint. Trent, by contrast, presented considerable evidence to show that VEA did not seriously act to protect itself against the supposedly unacceptable risk. The district court, had it considered the circumstantial as well as the direct evidence, might well have concluded differently. A new trial complete as to the evidence from both sides with both direct and circumstantial evidence properly weighed in the balance is required.
 
 
 32
 REVERSED and REMANDED for a new trial.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 In Trent v. Valley Elec. Assoc., 41 F.3d 524, 567 (9th Cir.1994) (citing E.E.O.C. v. Crown Zellerbach Corp., 720 F.2d. at 1013), this court held that Trent's complaint about having to listen to sexually offensive remarks at a mandatory training seminar conducted by an outside consultant constituted protected activity because she showed a reasonable belief that the employment practice she protested was prohibited under Title VII